FILED

17 NOV 22 AM 8:16

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: ___ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONTAYE CRAIG,<br><br>                              Petitioner,<br><br>v.<br><br>C. E. DUCART, Warden,<br><br>                              Respondent. | Case No.: 16cv2531-GPC(KSC)<br><br>**REPORT AND RECOMMENDATION RE PETITION FOR WRIT OF HABEAS CORPUS** |

Petitioner Dontaye Craig, a state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus ("Petition") challenging his conviction in San Diego Superior Court Consolidated Case No. SCD 225297.[1] [Doc. No. 1, at p. 1.] The Petition raises a single claim – whether the trial court violated petitioner's constitutional right to Due Process when it denied his request for access to recorded jail telephone conversations of a key witness for the prosecution that petitioner subpoenaed from the Sheriff's Department

---

[1] Petitioner was initially charged in Case No. SCD 234772. [Doc. No. 12-36, at pp. 2-7.] Later, the prosecutor's Motion to Consolidate was granted and SCD 225297 was designated as the lead case. [Doc. No. 12-36, at p. 78] A Consolidated Information was then filed against petitioner and his co-defendants on February 12, 2012 under Case No. SCD 225297. [Doc. No. 12-51, at pp. 63-70.]

1  that operates the jail. [Doc. No. 1, at pp. 6-7.] In his Traverse, petitioner argues that

2  access to the recorded jail telephone conversations would have resulted in a different

3  outcome at trial because of the overall "closeness" of the case. [Doc. No. 13, at p. 5.] In

4  support of this contention, petitioner's Traverse includes a copy of a portion of his

5  opening brief in the California Supreme Court arguing that his conviction is not

6  supported by substantial evidence. [Doc. No. 13, at pp. 6-11.]

7       This Court has reviewed the Petition [Doc. No. 1]; respondent's Answer and

8  supporting Memorandum of Point and Authorities [Doc. No. 11]; the Lodgments

9  submitted by respondent, including the state court record [Doc. No. 12]; and petitioner's

10  Traverse [Doc. No. 13]. For the reasons outlined below, IT IS HEREBY

11  RECOMMENDED that the District Court DENY the Petition.

12                            ***FACTUAL BACKGROUND***

13       In reviewing a federal Petition for Writ of Habeas Corpus, this Court gives

14  deference to the state court findings of fact and presumes them to be correct. Petitioner

15  may rebut this presumption of correctness, but only by clear and convincing evidence.

16  28 U.S.C. 2254(e)(1); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992). In this case, a

17  lengthy recitation of "the evidence most favorable to the judgment" is included in the

18  California Court of Appeal's decision on direct appeal, which affirmed petitioner's

19  judgment and conviction, but reversed with directions on certain matters related to

20  sentencing. [Doc. No. 12-45, at pp. 4 n.3; 4-12.] This lengthy recitation of facts will not

21  be repeated here in full, because only some facts are significant to the single issue raised

22  in the Petition.

23       Petitioner and his friends, Marlon Johnson, Fredrick Roberson, and Rashad Scott,

24  who were all active members of the Emerald Hills street gang, went to the Gaslamp

25  Quarter in downtown San Diego late on the evening of May 23, 2009. [Doc. No. 12-45,

26  at pp. 2, 4.] Johnson was the driver. After Johnson parked the car near the intersection of

27  E Street and Fifth Avenue, the group walked west together on E Street. [Doc. No. 12-45,

28  at p. 5.] Near the closing time for the bars in the Gaslamp (*i.e.*, early in the morning on

May 24, 2009), petitioner and his friends encountered rival gang members and a fight began on the crowded street of people leaving the bars in the area. [Doc. No. 12-45, at pp. 5-7.] Multiple shots were fired, and petitioner and his friends ran back to Johnson's car, got in, and drove away. [Doc. No. 12-45, at p. 7.]

A rival gang member, Richard Turner, was shot multiple times and seriously injured. [Doc. No. 12-45, at pp. 5, 7.] A young bystander, Lakiesha Mason, who was celebrating her 21st birthday, was shot in the head and killed. Another bystander, Willy Aldridge, was shot in the back and seriously injured. [Doc. No. 12-45, at p. 7.]

Johnson was arrested about a year later in March of 2010, and after being in jail for more than a year, he agreed to cooperate with the investigation and to testify against his friends and fellow gang members in exchange for a guilty plea to voluntary manslaughter and an admission to a gang allegation with a potential prison term of three to eleven years. [Doc. No. 12-6, at pp. 25; 12-45, at pp. 7-8 n.4.] Although there was other evidence connecting petitioner, Roberson, and Scott to the shooting, Johnson was the prosecution's key witness. In video and photographs taken around the time of the shooting, Johnson identified himself, Roberson, and Scott. He also testified that petitioner was standing to his left and slightly behind him when the photographs were taken, and in one of the photographs, it appeared that petitioner's arm was extended. [Doc. No. 12-45, at p. 8.]

In other key testimony, Johnson said that when they were all inside of his car after the incident, he asked who did the shooting. According to Johnson, "[petitioner], who was in the front seat, was holding a gun and admitted he was the shooter." [Doc. No. 12-45, at p. 8.] There was also some evidence indicating that Roberson was the shooter. [Doc. No. 12-45, at p. 2.]

### *PROCEDURAL HISTORY*

On August 27, 2010, a grand jury returned an indictment against Johnson and Roberson for the murder of Lakiesha Mason; the attempted murder of Richard Turner; and assault with a firearm on James Aldridge under Case No. SCD 225297. [Doc. No.

12-36, at p. 26.] On June 7, 2011, Johnson signed an agreement to testify for the prosecution against petitioner, Roberson, and Scott. [Doc. No. 12-22, at pp. 74-79.] Shortly thereafter, on June 17, 2011, petitioner and Scott were arraigned on the same charges under Case No. SCD 234772. [Doc. No. 12-36, at p. 27.] As noted above, the case was later consolidated under Case No. SCD 225297.[2]

A preliminary hearing commenced on September 29, 2011, and Johnson, who had been placed in protective custody, testified for the prosecution as agreed. [Doc. No. 12-22, at pp. 6-7, 12-23, 80-102.] His testimony at the preliminary hearing was consistent with his later testimony at trial. As summarized above, he implicated petitioner, Roberson, and Scott in the incident and said petitioner admitted he was the shooter. [Doc. No. 12-22, at pp. 74 *et seq.*]

On November 14, 2011, two investigators for the prosecution went to the jail and advised the facility commander they wanted to search cells occupied by Roberson and petitioner. They were then given access to the cells and were able to "tag and bag" all pieces of mail, letters, envelopes, correspondence, writings, and legal mail belonging to petitioner and Roberson in the presence of the facility commander. [Doc. No. 12-28, at pp. 62-65, 71-72 (Exhibit A).] The bag of evidence was then turned over to the prosecution unit for processing. [Doc. No. 12-28, at p. 72.]

/ / /

---

[2] A Consolidated Information was filed later on February 12, 2012 charging petitioner, Roberson, and Scott with the first degree murder of Lakiesha Mason (count 1); the attempted murder of Richard Turner (count 2); and assault with a firearm on James Aldridge (count 3). [Doc. No. 12-51, at pp. 63-70.] As to all co-defendants, the Consolidated Information further alleged that all counts were committed for the benefit of, at the direction of, and in association with a criminal street gang and with the specific intent to promote, further, and assist in criminal conduct by gang members. Other allegations in the Consolidated Information included personal use of a handgun causing great bodily injury and/or death to a person other than an accomplice. [Doc. No. 12-51, at pp. 63-70.]

On December 6, 2011, about three months after Johnson testified for the prosecution at the preliminary hearing, petitioner served the San Diego County Sheriff with a Subpoena *Duces Tecum* requesting production of the following documents and information: (1) a list of Johnson's visitors; (2) copies of Johnson's mail and e-mails; (3) a list of Johnson's phone calls; (4) copies of Johnson's recorded phone calls; (5) Johnson's housing records, including names of all cell mates; and (6) all of Johnson's movement records. [Doc. No. 12-28, at pp. 30-32.] The San Diego County Sheriff complied with the subpoena by delivering the requested materials to the trial court. [Doc. No. 12-28, at p. 24.]

As outlined more fully below, the portion of petitioner's subpoena that seeks access to Johnson's recorded jail calls was extensively litigated in the trial court starting on January 13, 2012 with an "informal conference to address records subpoenaed pursuant to a subpoena *duces tecum* issued . . . on behalf of [petitioner]." [Doc. No. 12-1, at p. 9; Doc. No. 12-35, at p. 62.] During this initial conference, the trial court asked whether anyone objected to the release of the subpoenaed records to petitioner's counsel. The prosecutor said, "I don't object." [Doc. No. 12-1, at p. 11.] However, the prosecutor and Johnson's counsel indicated it would be necessary for the trial court to conduct an *in camera* review of the records to avoid the release of any private or privileged information. [Doc. No. 12-1, at pp. 11-12.] The trial court indicated it would complete a "quick review" of the records, remove any privileged materials, and release "everything else" to petitioner's counsel. [Doc. No. 12-1, at p. 13.] The trial court added as follows: "My thought is that the record is clear, I don't see what's happening here to be a fishing expedition, and I think that, frankly, the Sixth Amendment right to have counsel be able to function effectively and to confront and cross-examine effectively are implicated here, and I think that unless there is some really strong privilege that would outweigh that, [petitioner's counsel] gets them. But I think it would be a good idea if I looked through them *in camera*." [Doc. No. 12-1, at p. 13.] In addition, the trial court stated that its

1 "Sixth Amendment comments" were based on the fact that Johnson testified for the
2 prosecution and was cooperating in the case. [Doc. No. 12-1, at p. 14.]

3     At the next pre-trial conference on January 26, 2012, the trial court requested
4 briefing from the parties on the subpoena matter and set the matter for hearing on
5 February 15, 2012. On February 7, 2012, petitioner filed a Motion for Order to Disclose.
6 In the Motion, petitioner argued that Johnson's recorded jail telephone conversations
7 should be transcribed for an *in camera* review by the trial court. To the extent the
8 conversations included impeachment or exculpatory evidence, petitioner argued they
9 should be released to counsel, because they were important to the defense. Petitioner and
10 his co-defendants were facing life sentences, and Johnson testified as the primary witness
11 for the prosecution at the preliminary hearing and was allowed to enter a plea for
12 approximately 11 years of incarceration. [Doc. No. 12-28, at pp. 21-29.]

13     The prosecutor filed an Opposition to the Motion to Disclose on February 8, 2012.
14 [Doc. No. 12-28, at p. 36.] The Opposition states that the prosecutor was "surprise[d]"
15 that the Sheriff's Department complied with the subpoena and did not file a motion to
16 quash. [Doc. No. 12-28, at p. 37.] In general, the prosecutor argued that the subpoenaed
17 materials should not be released to any of the defendants without a showing of "good
18 cause and materiality." [Doc. No. 12-28, at p. 37.] With respect to housing and
19 movement records, the prosecutor did not object to disclosure of this information to
20 defense counsel as long as it was not given to the defendants directly in order to protect
21 Johnson's safety and security. [Doc. No. 12-28, at pp. 37-38.] The prosecutor did
22 oppose the release of the names of Johnson's visitors and cell mates. In the prosecutor's
23 view, this request was a "fishing expedition" so that the defendants could contact visitors
24 and cell mates hoping they might provide relevant evidence. [Doc. No. 12-28, at p. 38.]
25 The prosecutor opposed release of electronic recordings of Johnson's phone calls absent a
26 showing of good cause, because it would require the trial court to conduct an extensive *in*
27 *camera* review to redact confidential or privileged matters. The prosecutor estimated
28 there was about 60 hours of recorded conversations and transcribing them "would take at

16cv2531-GPC(KSC)

least a month." [Doc. No. 12-28, at 38-39.] On the other hand, the prosecutor conceded that the trial court should release the records to defense counsel to the extent they were relevant and did not contain confidential, constitutionally protected, or privileged information. [Doc. No. 12-28, at p. 42.]

Johnson also filed an Opposition to the Motion for Order to Disclose. He argued that the subpoenaed materials should not be disclosed because there was no showing of good cause and because some of the materials might be privileged. [Doc. No. 12-38, at pp. 15-18.]

On February 15, 2012, the trial court heard oral argument on the Motion for Order to Disclose. [Doc. No. 12-21, at p. 10 *et seq.*; Doc. No. 12-35, at p. 64.] The trial court told the parties that the Sheriff's Department complied with the subpoena by delivering all of the materials requested to the trial court except for e-mails. [Doc. No. 12-21, at pp. 11-13.] The trial court said it "started listening" to some of Johnson's recorded jail telephone calls to screen out any privileged materials but indicated they were "not easy to hear" and included "a great deal of . . . ethnic speech . . . that I don't . . . fully understand." [Doc. No. 12-21, at p. 13.] Because of this difficulty and the volume of materials that were produced, the trial court decided to request briefing from the parties to ensure that the defendants were not on a "fishing expedition." [Doc. No. 12-21, at p. 14.] The trial court explained as follows:

> One can imagine, if the defense were to hit a gold mine in this case, finding a telephone call from a cooperating individual to the effect of, 'you know, I'll say anything I have to say to get out from under my beef and to shorten my sentence, and so go find out anything you can so I can tell the police I know this.' [¶]One can imagine a cooperating individual making a similar statement to anybody he's housed with or sitting on the bus next to: 'Do you know anything about this case that I can say to tell the cops so I can testify and throw somebody else down and get off of this?' [¶]Maybe less dramatic might be a situation where the witness just says something factually, which defense counsel from their review of the discovery might know is inconsistent with what he's told the police or the investigators, and that might be admissible evidence.

7

Please let me emphasize, I have zero reason, zero cause to believe that any of these things have happened in this case. I [am just] imagining these kinds of scenarios as reasons why the defense would want to get access to everybody he's talked to and everybody he's been housed with, so that they can go talk to them and try to find out. [¶]And, of course, that adds another layer of complexity, because some of those people are no less – are subject to all the credibility concerns that the cooperating individual is. So the bottom line is I'm asking counsel for guidance on these points. [¶]Is there some showing of good cause that has to be made to gain access to these materials that were produced by the sheriff pursuant to the subpoena *duces tecum*?

\* \* \* \*

But my question is: Is there some showing of good cause before the court is required to give access to these materials to the defense?

\* \* \* \*

The second question: If something more is required, what is it? Is it akin to probable cause? What kind of showing, if a showing needs to be made, is there to – that some nugget that the defense might use or that might lead to discoverable evidence is likely to be in this voluminous material?

\* \* \* \*

Thirdly, . . ., if the court's already said he's got no expectation of privacy in a jail cell, how is there an expectation of privacy that will attach to these telephone records?

\* \* \* \*

I don't say this lightly. I acknowledge the concerns that we all have, both conscientious prosecutors and conscientious defense attorneys and courts, of the problems that are inherent with cooperating individuals who are testifying. And every one of us, no matter what side of the coin, has a horror story or more than one that we can point to.

On the other hand, I mean, where do we draw the line? I mean, if there are 200 phone numbers here, do we turn over 200 phone numbers of people that Mr. Johnson has called on the, what, speculation, perhaps or reasonable possibility, depending on how you frame it, that he might have said something? Is that a fishing expedition?

Same with respect to his cellmates. Same with respect to his phone calls. Where does the line get drawn here in terms of just saying, 'access to the whole world or what?'

[Doc. No. 12-21, at pp. 14-18.]

During oral argument, defense counsel focused on several points. First, defense counsel argued that it was likely Johnson's recorded jail calls would include additional and perhaps more relevant impeachment evidence, because Johnson initially denied any connection to the shooting incident and told different stories when interviewed before he implicated petitioner and agreed to testify for the prosecution. [Doc. No. 12-21, at pp. 19-20.] Second, defense counsel indicated there was a witness who would say that Johnson indicated he was going to make up a story in order to get a deal. As a result, the defense should be permitted to discover calls Johnson made before he agreed to testify when he was talking to friends or close associates about his situation, particularly because this could be a "close case" that could turn on "one phone call by Mr. Johnson that impeaches him. . . ." [Doc. No. 12-21, at pp. 26-27, 41-42.] Third, defense counsel argued that case law requiring a showing of "good cause" or "plausible justification" are typically based on a third party's privacy interests, but as the trial court previously held in connection with the cell searches, Johnson did not have any privacy interest in his recorded jail telephone calls. [Doc. No. 12-21, at pp. 28-30]. Fourth, based on prior experiences in criminal cases, defense counsel indicated it is fairly common for incarcerated individuals to make admissions or confessions in recorded jail calls. As a result, defense counsel argued that it is certainly plausible under the circumstances that Johnson's calls would be helpful to the defense. In addition, it was defense counsel's understanding that the recorded jail calls are easily accessed by the prosecution with "no judicial oversight" and then used as evidence as needed. [Doc. No. 12-21, at pp. 30-32.] Fifth, based on the policies and procedures followed by the Sheriff's Department at the jail, it was defense counsel's understanding that Johnson's recorded calls would not

include privileged conversations with counsel unless there was some problem with the system. [Doc. No. 12-21, at pp. 33-35, 38-39.]

At the close of the hearing, the trial court concluded as a matter of law that there must be some showing of good cause and specific facts justifying the need for the disclosure of the subpoenaed materials, but said, "[W]hat isn't clear is what is sufficient." [Doc. No. 12-21, at pp. 53-54.] The trial court invited defense counsel to submit "under seal" specific factual averments believed to establish "good cause" by February 29, 2012. [Doc. No. 12-21, at pp. 55, 58.] To assist counsel, the trial court said, "[F]or instance, if you did have the name of a particular person that you wanted to see if there was verification that that person had shared a cell with Mr. Johnson, that might be a good place to include that, along with at least a thumbnail synopsis of what that person might say. . . ." [Doc. No. 12-21, at pp. 55-56.]

On March 7, 2012, the trial court issued a written Order ruling on the request for release of the subpoenaed materials. [Doc. No. 12-35, at pp. 65-66; Doc. No. 12-28, at pp. 58-59.] By this time, co-defendant's Roberson and Scott had joined in petitioner's request for the subpoenaed materials and each of the defendants had an opportunity to submit arguments "under seal" explaining why they believed there was "good cause for the release of the materials to them." [Doc. No. 35, at pp. 65-66.] The trial court then conducted an *in camera* review of some but not all of the materials. [Doc. No. 12-35, at p. 65.] Specifically, the trial court's March 7, 2012 Order states that the following were reviewed *in camera*: Johnson's visitor lists, housing records, and list of outgoing phone numbers. The trial court did not attempt to listen to all of the recorded telephone calls. In this regard, the trial court's Order states as follows: "These calls are not transcribed, are not always easy to hear, and frequently involve colloquial and 'street talk' speech patterns and words that are difficult to understand. The court finds there has been no showing of good cause to conclude that any of the calls are relevant." [Doc. No. 12-35, at p. 66.]

///

The trial court's March 7, 2012 Order rejected petitioner's argument that the subpoenaed materials were discoverable pursuant to the constitutional principles set forth by the Supreme Court in *Brady v. Maryland*, 373 U.S. 83 (1963). [Doc. No. 12-35, at pp. 65-66.] Citing *People v. Superior Court (Barrett)*, 80 Cal.App.4th 1305 (2000), the trial court's view was that *Brady* did not apply, because the Sheriff's Department was not part of the prosecution team. In other words, the prosecutor did not have possession of the subpoenaed materials. Instead, the Sheriff's Department possessed the subpoenaed materials only because it was custodian of the jail where Johnson was housed. [Doc. No. 12-35, at p. 65.]

Because the trial court concluded *Brady* did not apply, it found that petitioner could only obtain access to the materials by way of a third party subpoena based on the standards set forth in California statutory law governing discovery in criminal cases (*i.e.*, California Penal Code Section 1054 *et seq.*). Under the applicable California statutory law, the Sheriff's Department was required to produce the subpoenaed materials to the trial court for an *in camera* review. The trial court was then charged with determining whether petitioner made the required "showing of good cause—that is, specific facts justifying discovery." [Doc. No. 12-35, at pp. 65-66, quoting *Barrett*, 80 Cal.App. 4th at 1318.]

According to the trial court, "good cause" for the release of the subpoenaed materials was **_not_** established based on Johnson's cooperation with the prosecution and his receipt of a sentencing benefit for his cooperation. Nor was good cause established by the fact that Johnson had previously made inconsistent statements to investigating detectives. The trial court's view was that something more was required, such as specific facts indicating there was more than speculation that Johnson made statements to a particular individual that would be helpful to the defense. [Doc. No. 12-35, at p. 66.]

Based on the parties' submissions and the *in camera* review, the trial court's March 7, 2012 Order further states that it intended to release "specific items" described in separate orders "under seal" to petitioner and Roberson only. [Doc. No. 12-35, at p. 66.]

16cv2531-GPC(KSC)

As to these specific items, the trial court concluded petitioner and Roberson had established "good cause" for disclosure. [Doc. No. 12-35, at p. 66.] Only one of these "separate orders" could be located in the record, and it states that Roberson was provided with records of outgoing calls from Johnson to certain telephone numbers. [Doc. No. 12-35, at pp. 66-67.] Thus, from the record, it is unclear what materials were disclosed to petitioner at this point in time.

On March 16, 2012, petitioner filed a Motion for Reconsideration [Doc. No. 12-28, at pp. 51-57.] In the Motion, petitioner argued that counsel should be allowed to transcribe and review Johnson's recorded jail conversations, because it would be ineffective assistance of counsel if someone was not allowed to review this evidence. Petitioner argued that the jail conversations were discoverable, because "the veracity of this witness is crucial," "no one objected to the production of the tapes," and petitioner was facing a life sentence without parole "based on the testimony of primarily one witness." [Doc. No. 12-28, at pp. 54, 56.] It was further argued there would be *Brady* material in the recordings even though the prosecutor chose not to obtain or review the conversations of the cooperating witness. [Doc. No. 12-28, at p. 55.] In this regard, petitioner argued that *Brady* did apply despite the trial court's contrary conclusion. According to petitioner, *Brady* applied because the Sheriff's Department took part in a "cell search" related to the case; it is generally understood that the Sheriff's Department takes part in "gang" enforcement in "gang" cases; and the prosecutor had the ability to access the records "with just a telephone call." [Doc. No 12-28, at p. 55.]

In a Response to petitioner's Motion for Reconsideration [Doc. No. 12-28, at pp. 61-69], the prosecutor argued petitioner was not entitled to discover Johnson's recorded jail calls for several reasons. First, the prosecutor argued the recorded calls were not in the possession of the prosecutor. The prosecutor did not request disclosure of the calls as part of its investigation and the Sheriff's Department was not part of the prosecution team simply because it facilitated a cell search related to the investigation of the case. In support of this argument, the prosecutor attached a copy of a report about the cell

searches completed at the jail on November 14, 2011. [Doc. No. 12-28, at pp. 62-65, 71-72 (Exhibit A).]

Second, the prosecutor argued there was no duty to disclose the recorded calls to petitioner under *Brady*, because the duty to disclose only arises under *Brady* as to evidence possessed by the prosecution that is both material and favorable to the defense, and petitioner had not been able to establish either of these factors. [Doc. No. 12-28, at pp. 62-68.] Third, the prosecutor agreed with the trial court that petitioner was not entitled to review the recorded calls, because he did not establish good cause. [Doc. No. 12-28, at p. 68.]

On March 29, 2012, the trial court held a status conference and heard oral arguments on petitioner's Motion for Reconsideration. [Doc. No. 12-30, at pp. 255-270.] The trial court noted that it had previously ordered release of certain discovery materials to petitioner and Roberson, because they made a showing of good cause. However, the trial court also indicated that the materials released to them represented only "a fraction of the overall material that was produced by the sheriff in response to [petitioner's] subpoena." [Doc. No. 12-30, at p. 258.] During oral argument, counsel essentially repeated the arguments made previously in their moving and opposing papers. [Doc. No. 12-30, at pp. 259-264.] Although it considered additional materials petitioner submitted "under seal" to support the Motion for Reconsideration, the trial court said, "This is a fishing expedition." [Doc. No. 12-30, at p. 268.] In other words, petitioner did not provide anything specific enough to justify the release of additional materials. [Doc. No. 12-30, at p. 268.] The trial court did acknowledge that in "60 hours of conversation" it was likely there would be something helpful to the defense but said the cost of transcription would be "enormous" unless the defendants could "narrow it down." [Doc. No. 12-30, at p. 268.] In other words, the trial court decided not to alter its prior findings and conclusions. [Doc. No. 12-30, at pp. 258-259; 264-269.] On the other hand, the trial court stated it would maintain custody of the subpoenaed materials in case "good cause" develops as the case proceeds. [Doc. No. 12-30, at p. 269.]

16cv2531-GPC(KSC)

After the trial court stated it was unwilling to alter its prior ruling, Roberson's counsel indicated defense counsel could seek approval to "fund the transcription" in order to relieve some of the burden on the trial court. [Doc. No. 12-30, at p. 270.] The trial court responded as follows: "I think that ultimately those extraordinary orders [for funding] are subject to court approval, so what we would basically be doing is passing the buck one more step down the line. But if somebody comes in here with an order that says that your office is going to pay for it, I'll reconsider it. Absent that, I won't." [Doc. No. 12-30, at p. 270.]

Next, on April 17, 2012, Roberson's counsel filed a Motion for Transcription of Subpoenaed Jail Calls and a Declaration indicating Roberson and petitioner "received funding to pay for that transcription." [Doc. No. 12-28, at pp. 74-75.] According to counsel's Declaration, $5,000 had been approved to pay for the costs of transcribing Johnson's recorded jail calls. The Motion essentially requests that the trial court have the recorded jail calls transcribed and then conduct an *in camera* review to determine whether all or some of the calls should be released to defense counsel. [Doc. No. 12-28, at p. 74.]

On May 2, 2012, the trial court issued an Order Denying Motion for Transcription of Subpoenaed Jail Calls. [Doc. No. 12-30, at p. 47.] The Order refers to and incorporates the previous Order filed on March 7, 2012 and essentially concludes that the request to have Johnson's jail calls transcribed remains a "fishing expedition" even though the parties expressed a willingness to pay the transcription costs. [Doc. No. 12-30, at pp. 47-48.] Since the parties had not shown "good cause," it was the trial court's view that the parties had no legal right "to roam through these materials." [Doc. No. 12-37, at p. 48.]

Trial commenced on August 1, 2012. [Doc. No. 12-35, at p. 96.] On August 24, 2012, Johnson's girlfriend, Carmen Torres, testified for the prosecution. [Doc. No. 12-10, at pp. 40 *et seq.*] Following her testimony, defense counsel argued there was good cause for the trial court to release Johnson's recorded jail conversations to telephone

numbers associated with Torres, because her trial testimony indicated she "gave two very different statements" during the time period January 25, 2011 to May 18, 2011. [Doc. No. 12-10, at pp. 62-65.] After several discussions on the record with all counsel outside the presence of the jury, the trial court concluded there was good cause for the release of this limited set of Johnson's recorded jail telephone calls to all counsel. [Doc. No. 12-10, at pp. 62-65, 95-98; Doc. No. 12-11, at pp. 15, 47-50, 100-106, 112-114.] The trial court then provided all counsel with disks containing digital files of Johnson's recorded jail calls to Torres from January 25, 2011 to May 18, 2011. [Doc. No. 112-114.] Torres was then recalled for additional testimony. At this time, defense counsel were able to use this portion of Johnson's recorded jail calls to cross-examine Torres. [Doc. No. 12-15, at pp. 81 *et seq.*]

The prosecution's other key witness against petitioner was Tony Mallard. Mallard was subpoenaed and transferred from prison to testify against his will. [Doc. No. 12-8, at p. 249.] Mallard testified that he told a police detective he had a conversation with petitioner at a birthday party in October 2010, before petitioner was arrested for his involvement in the shooting. [Doc. No. 12-8, at p. 252.] According to Mallard, petitioner said he was trying to shoot a member of a rival gang but accidently hit a female. Mallard also said he asked petitioner why he parties every day, and petitioner responded that "he partied like it might be the last time or something like that." [Doc. No. 12-8, at pp. 259-261.] While in jail waiting to testify, Mallard testified he was approached in a threatening manner by other gang members on petitioner's behalf. As a result, he knew he was in danger and had to be placed in protective custody. [Doc. No. 12-8, at pp. 254-257.]

During trial, the defendants presented at least two witnesses to impeach Johnson's testimony. First, Kevin Wiggins testified he has known Johnson for several years and shared a cell with him before he settled the charges against him in this case. During this time, Wiggins testified that Johnson expressed fear of going to prison and even

considered suicide. He denied involvement in the shooting and said he was going to make up a story so he could get a deal and go home. [Doc. No. 12-11, at pp. 134-139.]

Second, Tommy Jacquett testified he was "locked up" in the same block as Johnson and Wiggins for several months before Johnson agreed to testify for the prosecution in this case. He was present a number of times when Johnson talked about his case. According to Jacquett, Johnson said he heard some shots on the night in question but did not know who fired the shots. Johnson also said his girlfriend was pressuring him to make a deal so their child would not grow up without a father. [Doc. No. 12-11, at pp. 168-175.] Jacquett further testified that Johnson was depressed and considered suicide because "he couldn't do that kind of time." [Doc. No. 12-11, at pp. 174.]

On September 17, 2012, a jury found petitioner guilty of first degree murder, attempted murder, and assault with a firearm. The jury also found that petitioner personally used a handgun in the commission of these offenses; was a principal in the offenses; and committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members. [Doc. No. 12-34, at pp. 139-143.] The same jury also found co-defendants Roberson and Scott guilty of first degree murder, attempted murder, and assault with a firearm. As to Roberson and Scott, the jury also found they were principals in these offenses, that one of the principals personally used a handgun, and that the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members. [Doc. No. 12-34, at pp. 148-165.]

On October 26, 2012, petitioner filed a Motion for a New Trial [Doc. No. 12-34, at p. 172], arguing once again that he should be permitted access to all of Johnson's recorded telephone calls, not just those he made to Torres, and be able to use them at a new trial. According to petitioner, access to the remainder of the undisclosed tapes of Johnson's recorded jail telephone calls would have revealed more inconsistencies and

16

would therefore have allowed counsel to conduct "a more thorough examination of Mr. Johnson." [Doc. No. 12-34, at p. 175.] Petitioner also argued there was insufficient evidence to support the verdicts and the prosecution failed to present sufficient evidence to satisfy the law regarding accomplices. [Doc. No. 12-34, at p. 175.] The People opposed the Motion on various grounds, and the trial court denied the Motion following oral arguments. [Doc. No. 12-18, at pp. 1, 10-18; Doc. No. 12-34, at pp. 215-223.]

On November 30, 2012, the trial court sentenced petitioner to 50 years to life on count one (murder). [Doc. No. 12-18, at p. 49.] On count two (attempted murder), the trial court imposed a consecutive term of nine years plus a 25-year-to-life term because the offense resulted in great bodily injury. [Doc. No. 12-18, at pp. 49-50.] On count three (assault with a firearm), the trial court imposed a consecutive term of one year plus one year and eight months. [Doc. No. 12-18, at pp. 50-51.] In sum, petitioner was sentenced to 11 years, 8 months, plus 75 years to life in state prison. [Doc. No. 12-18, at p. 51; Doc. No. 12-45, at p. 3 n.2.]

On January 16, 2014, petitioner filed his Opening Brief on appeal. One of petitioner's arguments was that the trial court abused its discretion and violated his constitutional rights under the Fifth and Sixth Amendments when it refused to review and/or to release Johnson's recorded jail calls and other jail records that petitioner subpoenaed from the San Diego County Sheriff. [Doc. No. 12-42, at pp. 3, 51-59.]

In an unpublished decision filed on June 5, 2015, the California Court of Appeal affirmed in part, reversed in part, and remanded the case to the trial court with directions for further proceedings. Based on the California Supreme Court's decision in *People v. Chiu*, 59 Cal.4th 155, 158-159 (2014), which was issued while petitioner's appeal was pending, the California Court of Appeal reversed the first degree murder convictions as to all defendants. [Doc. No. 12-45, at pp. 3-4, 54-55.] Citing *People v. Chiu*, 59 Cal.4th at 155, the California Court of Appeal's opinion states as follows: "[A]s a matter of law there is no aider and abettor culpability for first degree premeditated murder under the natural and probable consequences doctrine. The People concede the judgment must be

reversed insofar as defendants' first degree murder convictions are concerned because the jury was instructed guilt could be based on the natural and probable consequences doctrine, and the record does not show beyond a reasonable doubt that the jury did not rely on the doctrine." [Doc. No. 12-45, at p. 3.] The Court of Appeal directed the trial court to "give the People the option of accepting a reduction of the first degree murder convictions to second degree murder or retrying them on the greater offense." [Doc. No. 12-45, at p. 3.] If the People accepted a reduction of the judgment to second degree murder, the trial court was directed to re-sentence the defendants accordingly. [Doc. No. 12-45, at p. 55.] As addressed more fully below, the California Court of Appeal also rejected petitioner's other claims, including his argument that he was denied his right to Due Process, because the trial court denied his request for an *in camera* review of Johnson's recorded jail calls. [Doc. No. 12-45, at p. 39.]

Next, petitioner filed a Petition for Review with the California Supreme Court on or about July 15, 2015 to exhaust his state court remedies. [Doc. No. 12-46, at pp. 1-18.] Once again, petitioner argued that the trial court violated his Fifth and Sixth Amendment rights by refusing to conduct an *in camera* review or release Johnson's recorded jail telephone conversations. [Doc. No. 12-46, at pp. 13-15.] On September 9, 2015, the California Supreme Court summarily denied the Petition for Review. [Doc. No. 12-47, at p. 1.]

On December 4, 2015, petitioner appeared before the trial court for re-sentencing. [Doc. No. 12-50, at pp. 9, 11-20.] As permitted by the Court of Appeal's June 5, 2015 decision, the prosecutor accepted a reduction of the first degree murder conviction on count 1 to second degree murder. [Doc. No. 12-50, at p. 10.] The trial court therefore re-sentenced petitioner on count one to 15 years to life plus a consecutive 25-year-to-life term on the gang-related firearm enhancement. [Doc. No. 12-50, at p. 15.] On count two (attempted murder), the trial court re-sentenced petitioner to the upper term of nine years plus a consecutive 25-year-to-life term on the firearm enhancement. [Doc. No. 12-50, at pp. 16-17.] On count three (assault with a firearm), the trial court re-sentenced petitioner

1 to a consecutive term of one year plus one year and eight months for the gang
2 enhancement. [Doc. No. 12-50, at pp. 17-18.]

3     Although petitioner appealed following his re-sentencing [Doc. No. 12-53], the
4 California Court of Appeal affirmed the judgments in an unpublished opinion filed on
5 September 12, 2016. [Doc. No. 12-54, at pp. 1-5.] The instant Petition was then filed in
6 this Court on October 6, 2016. [Doc. No. 1.]

7 **I.**      *Standard of Review.*

8     Federal habeas corpus relief is available only to those who are in custody in
9 violation of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). "A
10 federal court may not issue the writ on the basis of a perceived error of state law." *Pulley*
11 *v. Harris*, 465 U.S. 37, 41 (1984). "[A] mere error of state law is not a denial of due
12 process." *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) (internal quotations omitted).

13     This Petition is governed by the provisions of the Antiterrorism and Effective
14 Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 327 (1997).
15 AEDPA imposes a "highly deferential standard for evaluating state-court rulings, which
16 demands that state-court decisions be given the benefit of the doubt." *Woodford v.*
17 *Visciotti*, 537 U.S. 19, 24 (2002) (internal citations and quotations omitted). Under
18 AEDPA, a habeas petition "on behalf of a person in custody pursuant to the judgment of
19 a State court shall not be granted with respect to any claim that was adjudicated on the
20 merits in State court proceedings unless the adjudication of the claim– (1) resulted in a
21 decision that was contrary to, or involved an unreasonable application of, clearly
22 established Federal law, as determined by the Supreme Court of the United States; or
23 (2) resulted in a decision that was based on an unreasonable determination of the facts in
24 light of the evidence presented in the State court proceeding." 28 U.S.C. §
25 2254(d)(1)&(2). For purposes of Section 2254(d)(1), "clearly established Federal law"
26 means "the governing legal principle or principles set forth by the Supreme Court at the
27 time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).
28 Therefore, a lack of controlling Supreme Court precedent can preclude habeas corpus

16cv2531-GPC(KSC)

relief. *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (concluding that the state court's decision did not unreasonably apply clearly established Supreme Court law, because the relevant cases provided "no clear answer to the question presented").

The AEDPA standard is highly deferential and "difficult to meet." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Federal habeas relief may be granted under the "contrary to" clause of Section 2254 if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court "on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). The focus of inquiry under the "contrary to" clause is "whether the state court's application of clearly established federal law is objectively unreasonable." *Id.* "[A]n unreasonable application is different from an incorrect one." *Id.* In other words, federal habeas relief cannot be granted simply because a reviewing court concludes based on its own independent judgment that the state court decision is erroneous or incorrect. *Id.* Habeas relief is only available under Section 2254(d)(1) "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts" with Supreme Court precedent. *Harrington v. Richter*, 562 U.S. at 102. In addition, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

Where there is no reasoned decision from the state's highest court, Federal Courts "look through" to the "last reasoned state-court opinion" and presume it provides the basis for the higher court's denial of a claim or claims. *Ylst v. Nunnemaker*, 501 U.S. 797, 805-806 (1991). If the state court does not provide a reason for its decision, the Federal Court must conduct an independent review of the record to determine whether the state court's decision is objectively unreasonable. *Crittenden v. Ayers*, 624 F.3d 943, 947 (9th Cir. 2010). To be objectively reasonable, a state court's decision need not specifically cite or rely on Supreme Court precedent. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]," the state

16cv2531-GPC(KSC)

1   court's decision will not be "contrary to clearly established Federal law." *Early v.*
2   *Packer*, 537 U.S. 3, 8 (2002).

3   **II.    *Review of Petitioner's Claim.***

4         **A.    *Allegations in the Petition.***

5         Petitioner contends that the trial court violated his constitutional rights to counsel,
6   confrontation, and due process under the Fifth and Sixth Amendments, when it declined
7   to complete an *in camera* review and/or to release Johnson's recorded jail telephone
8   conversations to his trial counsel. [Doc. No. 1, at pp. 6-7.] According to petitioner,
9   Johnson's recorded jail telephone conversations should have been disclosed, because they
10  were relevant as a source of potential impeachment evidence in light of Johnson's
11  decision to testify and identify him as the shooter. [Doc. No. 1, at pp. 6-7.] Petitioner
12  believes that access to Johnson's telephone calls "could have led to [his] complete
13  exoneration [] by creating reasonable doubt he was the shooter, [or] that he aided and
14  abetted the shooting, or ever possessed the murder weapon." [Doc. No. 13, at p. 13.]

15        In his Traverse, petitioner further argues that the trial court's decision to deny him
16  access to Johnson's recorded jail telephone calls was prejudicial. He believes that access
17  to these calls would have resulted in a different outcome, because of the overall
18  "closeness" of the case. [Doc. No. 13, at pp. 4-5.] In support of this contention,
19  petitioner's Traverse incorporates a copy of a portion of the opening brief he submitted to
20  the California Supreme Court arguing that his convictions are not supported by
21  substantial evidence. [Doc. No. 13, at pp. 6-11; Doc. No. 12-46.] Essentially,
22  petitioner's view is that the evidence against him at trial was not "substantial," because
23  he was not "positively identified by any [eye]witness at the scene" other than Johnson
24  despite his "commanding size" (6'3" tall; 285 lbs.); no physical evidence linked him to
25  the scene; Mallard's testimony "was inherently unbelievable;" and Johnson's testimony
26  was "inherently unbelievable and insufficiently corroborated." [Doc. No. 13, at pp. 7-
27  11.]

28  ///

## B.     *California Court of Appeal's Decision.*

The California Court of Appeal did not specifically address petitioner's constitutional claims. [Doc. No. 12-45, at pp. 39-40.] However, as noted above, a state court's decisions need not specifically cite Supreme Court precedent to be objectively reasonable as long as the reasoning and/or the result do not contradict Supreme Court precedent. *Early v. Packer*, 537 U.S. at 8.

Among other issues, such as the sufficiency of the evidence to support the verdicts, the California Court of Appeal considered whether the trial court abused its discretion by denying petitioner's request for an *in camera* review of Johnson's recorded jail calls. [Doc. No. 12-45, at p. 39.] Citing California case law, the Court of Appeal indicated there was a policy favoring "liberal" discovery in criminal cases, but said trial courts could properly refuse to grant discovery if it appeared to be a "fishing expedition." [Doc. No. 12-45, at p. 39.] The Court of Appeal noted that the trial court imposed a "good cause" requirement but did not find "good cause" except for "eight to 10 hours of Johnson's calls with his former girlfriend, Torres, based on inconsistencies in her statements before and after he implicated defendants." [Doc. No. 12-45, at p. 39 n.12.] As to the remainder of Johnson's recorded jail telephone calls, the California Court of Appeal's decision states as follows: "[Petitioner] asserts the court should not have imposed a good cause requirement, because he could not determine the impeachment value of the calls without their disclosure. Any abuse of discretion, however, was harmless because defendants thoroughly attacked Johnson's credibility through other evidence, such as his own admission of lying, and the testimony of fellow inmates Wiggins and Jacquette that Johnson was terrified of a life sentence and would do anything to cut a deal with the prosecution." [Doc. No. 12-45, at p. 40.]

On a related issue, the Court of Appeal stated that it had independently completed an *in camera* review of "Johnson's remaining jail records." [Doc. No. 12-45, at p. 40.] The Court of Appeal found "no exculpatory or impeachment material." [Doc. No. 12-45, at p. 40.]

## C. *Confrontation Clause.*

"The Confrontation Clause [in the Sixth Amendment] provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination." *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987). Here, petitioner's claim does not involve the first type of protection provided under the Confrontation Clause as he does not allege he was denied the right to face Johnson as his accuser. Rather, petitioner's claim falls under the right to conduct cross-examination. Petitioner contends that the trial court interfered with his right to effectively confront Johnson during cross-examination, because it denied him access to Johnson's recorded jail telephone calls. Petitioner believes that access to all of Johnson's recorded jail telephone calls was necessary for him to effectively cross-examine Johnson, because he believes the calls would have included impeachment evidence.

Petitioner's allegations do not state a viable claim under the Confrontation Clause. The Confrontation Clause is not a "constitutionally compelled rule of pretrial discovery." *Id.* at 52. Instead, "the right to confrontation is a trial right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination." *Id.* at 52. "Normally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses." *Id.* at 53. "The ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony." *Id.* at 53. "In short, the Confrontation Clause only guarantees '*an opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' [Citation omitted.]" *Id.* (emphasis in original).

Here, petitioner does not in any way allege that the trial court improperly restricted his ability to cross-examine Johnson by preventing him from asking Johnson certain types of questions. As a result, he does not have a viable constitutional claim under the Confrontation Clause and cannot establish an unreasonable application of clearly

16cv2531-GPC(KSC)

1  established Supreme Court law.  It is therefore RECOMMENDED that the District Court
2  DENY petitioner's claim that his constitutional rights under the Confrontation Clause
3  were violated because he was only allowed access to a relatively small portion of
4  Johnson's recorded jail telephone calls.

### D.   *Due Process.*

6      For the most part, clearly established Supreme Court law concerning a criminal
7  defendant's Due Process right to pre-trial discovery stems from *Brady v. Maryland*, 373
8  U.S. 83 (1963).  Based on the Due Process Clause of the Fourteenth Amendment, the
9  Supreme Court in *Brady v. Maryland*, 373 U.S. 83, held "that the suppression by the
10  prosecution of evidence favorable to an accused . . . violates due process where the
11  evidence is material either to guilt or to punishment, irrespective of the good faith or bad
12  faith of the prosecution."  *Id.* at 87.  The prosecutor's duty to disclose "encompasses
13  impeachment evidence as well as exculpatory evidence" and extends even to evidence
14  "'known only to police investigators and not to the prosecutor.  [Citation omitted.]"
15  *Strickler v. Greene*, 527 U.S. 263, 280 (1999).

16      Evidence is material "'if there is a reasonable probability that, had the evidence
17  been disclosed to the defense, the result of the proceeding would have been different.'
18  [Citation omitted.]"  *Id.*  "The mere possibility that an item of undisclosed information
19  might have helped the defense, or might have affected the outcome of the trial, does not
20  establish 'materiality' in the constitutional sense."  *United States v. Agurs*, 427 U.S. 97,
21  109-110 (1976).

22      More recent cases have stated the *Brady* rule in broader terms.  In *Kyles v. Whitley*,
23  514 U.S. 419, 433-434 (19950, for example, the Supreme Court stated as follows:  "[T]he
24  individual prosecutor has a duty to learn of any favorable evidence known to the others
25  acting on the government's behalf in the case, including the police."  *Id.* at 437 (emphasis
26  added).  *See also Youngblood v. W. Virginia*, 547 U.S. 867, 869-870 (2006); *Garcetti v.*
27  *Ceballos*, 547 U.S. 410, 447 (2006); *Strickler v. Greene*, 527 U.S. at 281.
28  / / /

16cv2531-GPC(KSC)

Respondent argues petitioner does not have a viable Due Process claim under *Brady*, because this case does not involve any failure by the prosecution to turn over impeachment or exculpatory evidence to petitioner or his co-defendants. Rather, the trial court decided not to allow disclosure of Johnson's recorded jail calls. [Doc. No. 11-1, at pp. 13-15.] The Court notes that petitioner and his co-defendants previously argued in the state court proceedings that there was a duty on the part of the prosecution under *Brady*, mostly because they believed the Sheriff's Department at the jail was essentially part of the prosecution team, because the prosecution team had easy access to the jail for investigative purposes (*i.e.*, the prosecution team could conduct cell searches and listen to recorded jail calls on an as needed basis). As an example, petitioner and his co-defendants cited cell searches conducted in this case for investigative purposes by the prosecution team with the cooperation of the deputies at the jail. However, petitioner did not cite, and this Court was unable to locate, any clearly established Supreme Court law extending a prosecutor's duty under *Brady* to search all possible and voluminous sources of evidence maintained by the government that are accessible to the prosecution in order to locate and disclose exculpatory or impeachment evidence. Accordingly, this Court cannot disagree with respondent's contention that petitioner does not have a viable Due Process claim under *Brady*.

As respondent points out, the Supreme Court in *Weatherford v. Bursey*, 429 U.S. 545, stated that: "There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one. . . ." *Id.* at 559. However, the Supreme Court's decision in *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987), does indicate that a criminal defendant seeking access to investigative materials outside the possession of the prosecutor does have a Due Process right to disclosure and/or an *in camera* review if "some plausible showing" is made to indicate the records include evidence that is both material and exculpatory to the defense. *Id.* at 56-61, 58 n.15. The defendant in *Pennsylvania v. Ritchie* was charged with sexually abusing his 13-year old daughter numerous times over a period of four years. *Id.* at 43. Police turned the matter over to a protective service

25

agency charged with investigating child abuse (CYS). *Id.* The defendant served CYS with a subpoena seeking disclosure of records compiled during the investigation *that the prosecutor had not reviewed for exculpatory or impeachment evidence or in preparation for trial*. CYS responded that the records were privileged and confidential under state law and refused to produce them. However, there was an exception allowing this information to be disclosed pursuant to a court order. *Id.* at 43-44, 57.

Because they "might contain the names of favorable witnesses, as well as other, unspecified exculpatory evidence," the defendant in *Pennsylvania v. Ritchie* argued he was entitled to disclosure of the investigative records maintained by CYS. *Id.* at 44. The trial court refused to order CYS to disclose any of its files. *Id.* The daughter testified against the defendant at trial as the prosecution's main witness, and the defendant was convicted on all counts. *Id.* at 44-45. On appeal, the defendant argued, *inter alia*, that his right to Due Process under the Fourteenth Amendment was violated because he was denied access to the records. *Id.* at 45, 55-56. The Supreme Court said that "[a] defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the [State's] files. . . . In the typical case . . . it is the State that decides which information must be disclosed. Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final. Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance." *Id.* at 59.

On the other hand, the Supreme Court in *Pennsylvania v. Ritchie* concluded that the defendant was entitled to present the trial court with "specific information" indicating the records were "material to the fairness of the trial." *Id.* at 60. If the defendant was able to make such a showing, the Supreme Court held that the interests of the defendant and the State "in ensuring a fair trial," as well as the State's "compelling interest in protecting its child-abuse information," could be fully protected "by requiring that the CYS files be submitted only to the trial court for *in camera* review." *Id.* at 60. Thereafter, the trial court "would be obligated to release information material to the

fairness of the trial" on an ongoing basis. *Id.* The Supreme Court remanded the case for an *in camera* review, stating that the defendant was "entitled to know whether the CYS file contains information that may have changed the outcome of his trial had it been disclosed." *Id.* at 61.

In this Court's view, petitioner and his co-defendants made fairly strong arguments as to why Johnson's recorded jail calls should be disclosed to them. Johnson was a key witness for the prosecution and had admittedly lied and made inconsistent statements about his involvement in the shooting incident. In addition, defense counsel indicated on the record during oral argument prior to trial that a witness would testify Johnson said he intended to make up a story in order to get a deal. As noted above, this witness then testified for the prosecution at trial and his prior statements were consistent with his trial testimony. All combined, petitioner and his co-defendants made a showing of materiality that appears comparable or stronger than the one made by the defendant in *Pennsylvania v. Ritchie*. However, unlike the confidentiality interests at issue in *Pennsylvania v. Ritchie*, the trial court in this case concluded Johnson had no right of privacy in his recorded jail calls unless he was speaking to counsel, and it was apparent in the record that any such calls could be segregated from other calls and withheld from disclosure. Based on a review of the record as a whole, it is this Court's view that it may have been more prudent to allow petitioner and his co-defendants to have access to Johnson's unprivileged recorded jail calls.

On the other hand, the question on Federal habeas review is not whether the state court's application of clearly established Supreme Court law is correct. Rather, the focus of inquiry is "whether the state court's application of clearly established federal law is objectively unreasonable." *Bell v. Cone*, 535 U.S. at 694. As noted above, it is also not necessary for the state court to specifically cite or rely on Supreme Court precedent, "[s]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court] precedent." *Early v. Packer*, 537 U.S. at 8.

1    Particularly given the large volume of Johnson's recorded jail calls during two or
2    so years of incarceration awaiting trial, the poor quality of the recordings, and the amount
3    of time it would have taken to examine them, the showing of petitioner and his co-
4    defendants was rather speculative and was reasonably viewed by the trial court as a
5    "fishing expedition." [Doc. No. 12-30, at p. 268.] As the trial court explained, the cost
6    of transcription would be "enormous" unless the defendants could "narrow it down."
7    [Doc. No. 12-30, at p. 268.] Later, when counsel was able to "narrow it down" by asking
8    for all calls Johnson made to Torres, his girlfriend, based on inconsistencies in her trial
9    testimony, the trial court granted the request and provided counsel with access to these
10   calls. [Doc. No. 12-10, at pp. 62-65, 95-98; Doc. No. 12-11, at pp. 15, 47-50, 100-106,
11   112-114.] Defense counsel were then able to use these calls to more effectively cross-
12   examine Torres. [Doc. No. 12-15, at pp. 8 *et seq.*]
13       Although the California Court of Appeal and the state trial court did not
14   specifically apply the exact standard set forth by the Supreme Court in *Pennsylvania v.*
15   *Ritchie*, 480 U.S. at 60, they essentially concluded petitioner did not make a "plausible
16   showing" with "specific information" indicating that Johnson's recorded jail calls were
17   "material to the fairness of the trial." *Pennsylvania v. Ritchie*, 480 U.S. at 60. The
18   California Court of Appeal also reasonably concluded that any error in denying
19   defendants access to the recorded calls was "harmless" (*i.e.*, it would not have changed
20   the outcome of the trial had the recorded calls been disclosed), based on the extent to
21   which petitioner and his co-defendants were able to impeach Johnson's testimony.
22   Indeed, it is difficult to imagine what more could have been discovered in the recorded
23   calls to more effectively impeach Johnson's testimony. As the Court of Appeal
24   mentioned, Johnson admitted to lying to investigators on more than one occasion, and
25   two fellow inmates testified that Johnson "was terrified of a life sentence and would do
26   anything to cut a deal with the prosecution." [Doc. No. 12-45, at p. 40.] In addition, as
27   noted above, one of Johnson's fellow inmates testified that Johnson said he was going to
28   make up a story so he could get a deal and go home. [Doc. No. 12-11, at p. 139.] In

1  sum, based on a review of the record, this Court cannot conclude the denial of

2  petitioner's Due Process claim in the state court proceedings was objectively

3  unreasonable under clearly established Supreme Court law.

4       Finally, this Court cannot agree with petitioner's contention that access to

5  Johnson's recorded jail calls would have resulted in a different outcome at trial because

6  of the overall "closeness" of the case, conflicting evidence, and witness credibility. [Doc.

7  No. 13, at pp. 5; 6-11.] Based on a review of the trial testimony, the case against

8  petitioner was compelling and not so close that one could conclude the outcome would

9  have been different based on additional, cumulative evidence attacking Johnson's

10 credibility. Moreover, Section 2254(d) "gives federal habeas courts no license to re-

11 determine credibility of witnesses whose demeanor has been observed by the state trial

12 court, but not by them." *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983).

13      Based on the foregoing, it was not objectively unreasonable under clearly

14 established Supreme Court law for the state court to deny petitioner access to

15 approximately 50 to 60 hours of recorded jail calls made over an extended period of time

16 by the prosecution's key witness while he was awaiting trial before and after he agreed to

17 testify for the prosecution. It is therefore RECOMMENDED that the District Court

18 DENY petitioner's claim that his constitutional right to Due Process was violated when

19 the trial court denied his request for complete disclosure of Johnson's recorded jail

20 telephone calls.

21                    ***CONCLUSION AND RECOMMENDATION***

22      This Report and Recommendation is submitted to the assigned United States

23 District Judge pursuant to Title 28, United States Code, Section 636(b), and Civil Local

24 Rules 72.1(d) and HC.2 of the United States District Court for the Southern District of

25 California.

26      Based on the parties' moving and opposing papers and exhibits, IT IS HEREBY

27 RECOMMENDED that the District Court issue an order: (1) approving and adopting

28

16cv2531-GPC(KSC)

this Report and Recommendation; and (2) directing that judgment be entered DENYING the Petition.

IT IS HEREBY ORDERED that no later than ***January 19, 2018*** any party to this action may file and serve written objections to this Report and Recommendation. The document should be captioned "Objection to Report and Recommendation.

IT IS FURTHER ORDERED that any reply to the objection shall be filed and served no later than ***February 2, 2018***. The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appear of this Court order. *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

IT IS SO ORDERED.

Dated: November 21, 2017

Hon. Karen S. Crawford
United States Magistrate Judge