UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONTAYE CRAIG,<br><br>               Petitioner,<br><br>v.<br><br>C.E. DUCART, Warden,<br><br>               Respondent. | Case No.:  3:16-cv-02531-GPC-KSC<br><br>**ORDER**<br><br>**(1) ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION DENYING PETITION FOR WRIT OF HABEAS CORPUS;**<br><br>**(2) GRANTING CERTIFICATE OF APPEALABILITY**<br>**[DKT. NO. 14.]** |

## I.      INTRODUCTION

On October 6, 2016, Petitioner Dontaye Craig ("Craig"), a state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254, challenging his conviction in San Diego Superior Court Consolidated Case No. SCD

225297.[1] Dkt. No. 1, at 1.[2] The Petition raises a single issue—whether the state trial court violated Craig's constitutional right to Due Process when it denied his request for access to recorded jail telephone conversations of a key witness for the prosecution that Craig subpoenaed. Dkt. No. 1, at 6-7. On February 16, 2017, respondent filed a Response and supporting Lodgments. Dkt. Nos. 11, 12. On March 20, 2017, Craig filed a Traverse[3] as to the matters raised in the Response, arguing that access to the recorded jail telephone conversations would have resulted in a different outcome at trial because of the overall "closeness" of the case. Dkt. No. 13.

On November 22, 2017, pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California, Magistrate Judge Karen S. Crawford filed a Report and Recommendation ("Report") recommending that this Court deny the Petition. Dkt. No. 14. On May 9, 2018, Craig filed objections ("Objections") to the Magistrate Judge's Report. Dkt. No. 19.[4]  On August 1, 2018, this Court directed Respondent to supplement the record regarding three sealed documents referenced during state court trial proceedings.  Dkt. No. 20.  As a result of this directive, two packages—issued under seal—were received by this Court. One package, from the trial judge, the Honorable Charles G. Rogers, contained Craig's February 29, 2012 motion

---

[1]     Craig was initially charged in Case No. SCD 234772. Lodgment 5-7 at 2-7. Later, the prosecutor's Motion to Consolidate was granted and SCD 225297 was designated as the lead case. Lodgment 5-7 at 78. A Consolidated Information was then filed against Craig and his co-defendants on February 12, 2012 under Case No. SCD 225297. Lodgment 19 at 63-70.

[2]     Dkt page citations reference the CM/ECF pagination system. Page citations to Lodgments reference the lodgment's pagination; the Lodgment is located at Dkt No. 12.

[3]     Petitioner's Traverse includes a copy of a portion of his opening brief in the California Supreme Court arguing that his conviction is not supported by substantial evidence; however, nowhere in the Traverse does Craig address federal habeas standards.  *See* Dkt. No. 13.

[4]     This Court twice granted extensions for Petition to file Objections to the Report.  *See* Dkt. Nos. 16-18.

2

to disclose subpoena duces tecum of informant, Dkt. No. 31-1, at 14, and the trial court's March 7, 2012 order denying that motion, Dkt. No. 31-3. The other package, from the California Court of Appeal, Fourth Appellate District, Division One, contained a declaration of Investigator Jon Lane, which had been filed as an exhibit to Craig's motion for reconsideration of a motion to disclose. Dkt. No. 31-2, at 5. After receipt of the aforementioned, the Court caused the documents to be filed under seal to the docket. Dkt. No. 30.

After a thorough review of the issues, supporting documents, and applicable law, the Court **ADOPTS** the Magistrate Judge's Report, **OVERRULES** Craig's objections, and **DENIES** the petition for writ of habeas corpus, but will **GRANT** a certificate of appealability.

## II.    FACTUAL BACKGROUND[5]

On the evening of May 23, 2009, Craig and his friends, Marlon Johnson, Frederick Roberson, and Rashad Scott, all active members of the Emerald Hills street gang, went to the Gaslamp Quarter in downtown San Diego. Lodgment 14 at 2, 4. After Johnson, the driver, parked the car near the intersection of E Street and Fifth Avenue, the group walked west together on E Street. Lodgment 14 at 5. In the early morning of May 24, 2009, Craig and his friends encountered rival gang members and a fight began on the crowded street, during which multiple shots were fired. Lodgment 14 at 5-7. A rival gang member, Richard Turner, was shot multiple times and seriously injured. Lodgment 14 at

---

[5]    After conducting its own full review of the record, this Court recites the facts presented in the Report. The Report draws the facts set forth in this section from the California Court of Appeals' decision on direct appeal. Lodgment 14 at 4-12. Such factual findings are presumed to be correct. 28 U.S.C. § 2254(e)(1) (state court factual findings are presumed correct, unless rebutted by clear and convincing evidence). In this case, a lengthy recitation of "the evidence most favorable to the judgment" is included in the California Court of Appeal's decision on direct appeal, which affirmed petitioner's judgment and conviction, but reversed with directions on certain matters related to sentencing. Lodgment 14, at 4 n.3, 4-12. This lengthy recitation of facts will not be repeated here in full, because only some facts are significant to the single issue raised in the Petition.

3

5, 7. Two bystanders were also shot, including Lakeisha Mason, who was killed. Lodgment 14 at 7. Craig and his friends ran back to Johnson's car and drove away. Lodgment 14 at 7.

In March 2010, Johnson was arrested, and after being in jail for more than a year, agreed to cooperate with the investigation and to testify against his friends and fellow gang members in exchange for a guilty plea to voluntary manslaughter and an admission to a gang allegation with a potential prison term of three to eleven years. Lodgment 1-6 at 25; Lodgment 14 at 7-8 n.4.

Although there was other evidence connecting Craig, Roberson, and Scott to the shooting, Johnson was the prosecution's key witness. In video and photographs taken around the time of the shooting, Johnson identified himself, Roberson, and Scott. He also testified that Craig was standing to his left and slightly behind him when the photographs were taken, and in one of the photographs, it appeared that Craig's arm was extended. Lodgment 14 at 8. Johnson also testified that when they were all inside of his car after the incident, he asked who did the shooting. According to Johnson, "Craig, who was in the front seat, was holding a gun and admitted he was the shooter." Lodgment 14 at 8.

There was also some evidence indicating that Roberson was the shooter. Lodgment 14 at 2. Roberson was the first member of the group to initiate the physical fight when he "threw off his hoodie and sucker punched a member of Turner's group." Lodgment 14 at 7. Craig, Roberson, and Scott wore black hoodies. Lodgment 14 at 5. Roberson also wore a gray baseball cap with an "SD" insignia on it. Lodgment 14 at 5. A black hoodie, a gray baseball cap with an "SD" insignia with Roberson's DNA, and four .38-special-caliber bullet fragments were found at the scene. Lodgment 14 at 7. Gunshot residue was found on the hoodie. Lodgment 14 at 7. When Roberson was arrested in August 2010, he had a baseball cap with an "SD" insignia that was nearly identical to the one found at the scene. Lodgment 14 at 7.

4

## III.  PROCEDURAL HISTORY[6]

### A.  Pre-Trial Proceedings

On August 27, 2010, a grand jury returned an indictment against Johnson and Roberson for the murder of Lakeisha Mason; the attempted murder of Richard Turner; and assault with a firearm on James Aldridge under Case No. SCD 225297. Lodgment 5-7 at 26. On June 7, 2011, Johnson signed an agreement to testify for the prosecution against Craig, Roberson, and Scott. Lodgment 3-1 at 74-79. On June 17, 2011, Craig and Scott were arraigned on the same charges under Case No. SCD 234772. Lodgment 5-7 at 27. The case was later consolidated under Case No. SCD 225297.[7]

A preliminary hearing commenced on September 29, 2011, and Johnson, who had been placed in protective custody, testified for the prosecution as agreed. Lodgment 3-1 at 6-7, 12-23, 80-102. His testimony at the preliminary hearing was consistent with his later testimony at trial. Johnson implicated Craig, Roberson, and Scott in the incident and testified that Craig admitted he was the shooter. Lodgment 3-1 at 74 *et seq.*

On November 14, 2011, two investigators for the prosecution went to the jail and advised the facility commander they wanted to search cells occupied by Roberson and Craig. They were then given access to the cells and were able to "tag and bag" all pieces of mail, letters, envelopes, correspondence, writings, and legal mail belonging to Craig and Roberson in the presence of the facility commander. Lodgment 5-1 at 62-65, 71-72 (Exhibit A). The bag of evidence was then turned over to the prosecution unit for processing.

---

[6]      After conducting its own full review of the record, this Court presents in significant part the procedural background as taken from the Report.

[7]      A Consolidated Information was filed later on February 12, 2012 charging Craig, Roberson, and Scott with the first-degree murder of Lakeisha Mason (count 1); the attempted murder of Richard Turner (count 2); and assault with a firearm on James Aldridge (count 3). Lodgment 19 at 63-70. As to all co-defendants, the Consolidated Information further alleged that all counts were committed for the benefit of, at the direction of, and in association with a criminal street gang and with the specific intent to promote, further, and assist in criminal conduct by gang members. Other allegations in the Consolidated Information included personal use of a handgun causing great bodily injury and/or death to a person other than an accomplice. Lodgment 19 at 63-70.

Lodgment 5-1 at 72.

On December 6, 2011, about three months after Johnson testified for the prosecution at the preliminary hearing, Craig served the San Diego County Sheriff with a Subpoena *Duces Tecum* requesting production of the following documents and information: (1) a list of Johnson's visitors; (2) copies of Johnson's mail and e-mails; (3) a list of Johnson's phone calls; (4) copies of Johnson's recorded phone calls; (5) Johnson's housing records, including names of all cell mates; and (6) all of Johnson's movement records. Lodgment 5-1, part 1 at 30-32. The San Diego County Sheriff complied with the subpoena by delivering the requested materials to the trial court. Lodgment 5-1, part 1 at 24.

The portion of Craig's subpoena that sought access to Johnson's recorded jail calls was extensively litigated in the trial court starting on January 13, 2012 with an "informal conference to address records subpoenaed pursuant to a subpoena *duces tecum* issued . . . on behalf of [Craig]." Lodgment 1-1 at 9; Lodgment 5-6 at 62. During this initial conference, the trial court asked whether anyone objected to the release of the subpoenaed records to Craig's counsel. The prosecutor said, "I don't object." Lodgment 1-1 at 11. However, the prosecutor and Johnson's counsel indicated it would be necessary for the trial court to conduct an *in camera* review of the records to avoid the release of any private, sensitive, or attorney-client privileged information. Lodgment 1-1 at 11-12. The trial court indicated it would complete a "quick review" of the records, remove any privileged materials, and release "everything else" to Craig's counsel. Lodgment 1-1 at 13. The trial court added as follows: "My thought is that the record is clear, I don't see what's happening here to be a fishing expedition, and I think that, frankly, the Sixth Amendment right to have counsel be able to function effectively and to confront and cross-examine effectively are implicated here, and I think that unless there is some really strong privilege that would outweigh that, [Craig's counsel] gets them. But I think it would be a good idea if I looked through them *in camera*." Lodgment 1-1 at 13. In addition, the trial court stated that its

"Sixth Amendment comments" were based on the fact that Johnson testified for the prosecution and was cooperating in the case. Lodgment 1-1 at 14.

On January 26, 2012, at the next pre-trial conference, the trial court requested briefing from the parties on the subpoena matter and set the matter for hearing on February 15, 2012. Lodgment 5-1, part 1 at 37. On February 7, 2012, Craig filed a Motion for Order to Disclose. In the Motion, Craig argued that Johnson's recorded jail telephone conversations should be transcribed for an *in camera* review by the trial court. To the extent the conversations included impeachment or exculpatory evidence, Craig argued they should be released to counsel, because they were important to the defense. Craig and his co-defendants were facing life sentences, and Johnson testified as the primary witness for the prosecution at the preliminary hearing and was allowed to enter a plea for approximately 11 years of incarceration. Lodgment 5-1, part 1 at 21-29.

The prosecutor filed an Opposition to the Motion to Disclose on February 8, 2012. Lodgment 5-1, part 1 at 36. The Opposition states that the prosecutor was "surprise[d]" that the Sheriff's Department complied with the subpoena and did not file a motion to quash. Lodgment 5-1, part 1 at 37. In general, the prosecutor argued that the subpoenaed materials should not be released to any of the defendants without a showing of "good cause and materiality." Lodgment 5-1, part 1 at 37. With respect to housing and movement records, the prosecutor did not object to disclosure of this information to defense counsel as long as it was not given to the defendants directly in order to protect Johnson's safety and security. Lodgment 5-1, part 1 at 37-38. The prosecutor did oppose the release of the names of Johnson's visitors and cell mates. In the prosecutor's view, this request was a "fishing expedition" so that the defendants could contact visitors and cell mates hoping they might provide relevant evidence. Lodgment 5-1, part 1 at 38. The prosecutor opposed release of electronic recordings of Johnson's phone calls absent a showing of good cause, because it would require the trial court to conduct an extensive *in camera* review to redact

confidential or privileged matters. The prosecutor estimated there was about 60 hours of recorded conversations and transcribing them "would take at least a month." Lodgment 5-1, part 1 at 38-39. On the other hand, the prosecutor conceded that the trial court should release the records to defense counsel to the extent they were relevant and did not contain confidential, constitutionally protected, or privileged information. Lodgment 5-1, part 1 at 42.

Johnson also filed an Opposition to the Motion for the Order to Disclose. He argued that the subpoenaed materials should not be disclosed because there was no showing of good cause and because some of the materials might be privileged. Lodgment 7 at 15-18.

On February 15, 2012, the trial court heard oral argument on the Motion for Order to Disclose. Lodgment 2-2 at 10 *et seq.*; Lodgment 5-6 at 64. The trial court told the parties that the Sheriff's Department complied with the subpoena by delivering all of the materials requested to the trial court except for e-mails. Lodgment 2-2 at 11-13. The trial court said it had "started listening" to some of Johnson's recorded jail telephone calls to screen out any privileged materials but indicated they were "not easy to hear" and included "a great deal of . . . ethnic speech . . . that I don't . . . fully understand." Lodgment 2-2 at 13. Because of this difficulty and the volume of materials that were produced, the trial court decided to request briefing from the parties to ensure that the defendants were not on a "fishing expedition." Lodgment 2-2 at 14. The trial court explained as follows:

> One can imagine, if the defense were to hit a gold mine in this case, finding a telephone call from a cooperating individual to the effect of, 'you know, I'll say anything I have to say to get out from under my beef and to shorten my sentence, and so go find out anything you can so I can tell the police I know this.' [¶]One can imagine a cooperating individual making a similar statement to anybody he's housed with or sitting on the bus next to: 'Do you know anything about this case that I can say to tell the cops so I can testify and throw somebody else down and get off of this?' [¶]Maybe less dramatic might be a situation where the witness just says something factually, which defense counsel from their review of the discovery might know is inconsistent with what he's told the police or the investigators, and that

might be admissible evidence.

Please let me emphasize, I have zero reason, zero cause to believe that any of these things have happened in this case. I [am just] imagining these kinds of scenarios as reasons why the defense would want to get access to everybody he's talked to and everybody he's been housed with, so that they can go talk to them and try to find out. [¶]And, of course, that adds another layer of complexity, because some of those people are no less – are subject to all the credibility concerns that the cooperating individual is. So the bottom line is I'm asking counsel for guidance on these points. [¶I]s there some showing of good cause that has to be made to gain access to these materials that were produced by the sheriff pursuant to the subpoena *duces tecum*?

* * * *

But my question is: Is there some showing of good cause before the court is required to give access to these materials to the defense?

* * * *

The second question: If something more is required, what is it? Is it akin to probable cause? What kind of showing, if a showing needs to be made, is there to – that some nugget that the defense might use or that might lead to discoverable evidence is likely to be in this voluminous material?

* * * *

Thirdly, . . ., if the court's already said he's got no expectation of privacy in a jail cell, how is there an expectation of privacy that will attach to these telephone records?

* * * *

I don't say this lightly. I acknowledge the concerns that we all have, both conscientious prosecutors and conscientious defense attorneys and courts, of the problems that are inherent with cooperating individuals who are testifying. And every one of us, no matter what side of the coin, has a horror story or more than one that we can point to.

On the other hand, I mean, where do we draw the line? I mean, if there are 200 phone numbers here, do we turn over 200 phone numbers of people that Mr. Johnson has called on the, what, speculation, perhaps or reasonable

9

possibility, depending on how you frame it, that he might have said something? Is that a fishing expedition?

Same with respect to his cellmates. Same with respect to his phone calls. Where does the line get drawn here in terms of just saying, 'access to the whole world or what?'

Lodgment 2-2 at 14-18.

During oral argument, defense counsel focused on several points. First, defense counsel argued that it was likely Johnson's jail calls would include additional and perhaps more relevant impeachment evidence, because Johnson initially denied any connection to the shooting incident and told different stories when interviewed before he implicated Craig and agreed to testify for the prosecution. Lodgment 2-2 at 19-20.

Second, defense counsel indicated there was a witness who would say that Johnson indicated he was going to make up a story in order to get a deal. As a result, the defense should be permitted to discover calls Johnson made before he agreed to testify when he was talking to friends or close associates about his situation, particularly because this could be a "close case" that could turn on "one phone call by Mr. Johnson that impeaches him. . . ." Lodgment 2-2 at 26-27, 41-42.

Third, defense counsel argued that case law requiring a showing of "good cause" or "plausible justification" are typically based on a third party's privacy interests, but as the trial court previously held in connection with the cell searches, Johnson did not have any privacy interest in his recorded jail telephone calls. Lodgment 2-2 at 28-30.

Fourth, based on prior experiences in criminal cases, defense counsel indicated it is fairly common for incarcerated individuals to make admissions or confessions in recorded jail calls. As a result, defense counsel argued that it is certainly plausible under the circumstances that Johnson's calls would be helpful to the defense. In addition, it was defense counsel's understanding that the recorded jail calls are easily accessed by the

prosecution with "no judicial oversight" and then used as evidence as needed. Lodgment 2-2 at 30-32.

Fifth, based on the policies and procedures followed by the Sheriff's Department at the jail, it was defense counsel's understanding that Johnson's recorded calls would not include privileged conversations with counsel unless there was some problem with the system. Lodgment 2-2 at 33-34, 38-39.

At the close of the hearing, the trial court concluded as a matter of law that there must be some showing of good cause and specific facts justifying the need for the disclosure of the subpoenaed materials, but said, "[W]hat isn't clear is what is sufficient." Lodgment 2-2 at 53-54. The trial court invited defense counsel to submit under seal "specific factual averments" believed to establish "good cause" by February 29, 2012. Lodgment 2-2 at 55, 58. To assist counsel, the trial court said, "[F]or instance, if you did have the name of a particular person that you wanted to see if there was verification that that person had shared a cell with Mr. Johnson, that might be a good place to include that, along with at least a thumbnail synopsis of what that person might say. . . ." Lodgment 2-2 at 55-56.

On February 29, 2012, Craig filed a sealed motion responsive to the trial court's solicitation for "specific factual averments." Dkt. No. 31-1, at 14. In that motion, Craig argued that an analysis of the subpoenaed materials might reveal additional statements made by Johnson which would contradict statements previously given to law enforcement officers, since previous interviews already demonstrate that Johnson "has told inconsistent stories." *Id.* at 16.[8] ("There can be no doubt that in prior phone

---

[8] As previously discussed, this motion was supplied under seal to the Court by the trial court judge after Respondent made him aware of this Court's order for supplemental records. Although this Court has ordered all records received in response to the Court's order for supplemental records filed under seal, Dkt. No. 30, the Court does not find that its present, limited quotations from those records will encroach on any of the rationales for confidentiality that might have prompted the sealing of the materials by the state courts in the first place.

conversations Mr. Johnson made statements contrary to his present version of events.").)
Craig also asked for discovery of a phone call believed to be made by Craig to Johnson
while Johnson was in jail; "[i]t is believed that the conversation will show that Mr. Craig
was not involved" in the shooting. *Id.* at 7. Craig further stated that "[i]t is also believed
that informant had similar phone conversations with others which may have been
recorded." *Id.*

On March 7, 2012, the trial court issued a written Order ruling on the request for
release of the subpoenaed materials. Lodgment 5-6 at 65-66; Lodgment 5-1, part 1 at 58-
59. By this time, co-defendants Roberson and Scott had joined in Craig's request for the
subpoenaed materials and each of the defendants had an opportunity to submit arguments
"under seal" explaining why they believed there was "good cause for the release of the
materials to them." Lodgment 5-6 at 65-66. The trial court then conducted an *in camera*
review of some but not all of the materials. Lodgment 5-6 at 65. Specifically, the trial
court's March 7, 2012 Order states that the following were reviewed *in camera*:
Johnson's visitor lists, housing records, and list of outgoing phone numbers. The trial
court did not attempt to listen to all of the recorded telephone calls. In this regard, the
trial court's Order states as follows: "These calls are not transcribed, are not always easy
to hear, and frequently involve colloquial and 'street talk' speech patterns and words that
are difficult to understand. The court finds that there has been no showing of good cause
to conclude that any of the calls are relevant." Lodgment 5-6 at 66.

The trial court's March 7, 2012 Order rejected Craig's argument that the
subpoenaed materials—as a whole—were discoverable pursuant to the constitutional
principles set forth by the Supreme Court in *Brady v. Maryland*, 373 U.S. 83 (1963).
Lodgment 5-6 at 65-66. Citing *People v. Superior Court (Barrett)*, 80 Cal. App. 4th 1305
(2000), the trial court's view was that *Brady* did not apply, because the Sheriff's
Department was not part of the prosecution team. In other words, the prosecutor did not

have possession of the subpoenaed materials. Instead, the Sheriff's Department possessed the subpoenaed materials only because it was custodian of the jail where Johnson was housed. Lodgment 5-6 at 65.

Because the trial court concluded *Brady* did not apply, it found that Craig could only obtain access to the materials by way of a third-party subpoena based on the standards set forth in California statutory law governing discovery in criminal cases (*i.e.*, California Penal Code Section 1054 *et seq*.). Under the applicable California statutory law, the Sheriff's Department was required to produce the subpoenaed materials to the trial court for an *in camera* review. The trial court was then charged with determining whether Craig made the required "showing of good cause—that is, specific facts justifying discovery." Lodgment 5-6 at 65-66 (quoting *Barrett*, 80 Cal. App. 4th at 1318).

According to the trial court, "good cause" for the wholesale release of the subpoenaed materials was *not* established based on Johnson's cooperation with the prosecution and his receipt of a sentencing benefit for his cooperation. Nor was good cause established by the fact that Johnson had previously made inconsistent statements to investigating detectives. The trial court's view was that something more was required, such as specific facts indicating there was more than speculation that Johnson made statements to a particular individual that would be helpful to the defense. Lodgment 5-6 at 66.

However, the trial court found that a limited set of requested materials could be released. Based on the parties' submissions and the *in camera* review of Johnson's visitor lists, housing records, movement records, and a list of phone numbers to which outgoing phone calls had been placed, the trial court's March 7, 2012 Order further stated that it intended to release "specific items" described in separate orders "under seal" to Craig and Roberson only. Lodgment 5-6 at 66. As to these specific items, the trial court

concluded Craig and Roberson had established "good cause" for disclosure. Lodgment 5-6 at 66.

One of these "separate orders" stated that Roberson was provided with records of outgoing calls from Johnson to certain telephone numbers. Lodgment 5-6 at 66-67. Another separate order was issued under seal, addressing Craig's February 29, 2012 motion. Dkt. No. 31-3.[9] There, the trial court enumerated several categories of materials for which defense counsel had demonstrated good cause for *in camera* review. It found good cause only as to "materials that might show a telephone call placed by Johnson to Craig." *Id.* The trial court then advised that its *in camera* review of jail call logs did not reveal any telephone calls to Craig from Johnson. *Id.* Notably, the court did not find good cause to scour Johnson's jail telephone recordings in search of (1) statements made over the jail telephone that may be contrary to Johnson's current testimony, or (2) any "similar phone conversations with others (besides Craig) which may have been recorded," tending to prove that Craig had not been involved in the shooting.

On March 16, 2012, Craig filed a Motion for Reconsideration. Lodgment 5-1, part 1 at 51-57. In the Motion, Craig argued that counsel should be allowed to transcribe and review Johnson's recorded jail conversations, because it would be ineffective assistance of counsel if someone was not allowed to review this evidence. Craig argued that the jail conversations were discoverable, because "the veracity of this witness is crucial," "no one objected to the production of the tapes," and Craig was facing a life sentence without parole "based on the testimony of primarily one witness." Lodgment 5-1, part 1 at 54, 56. It was further argued there would be *Brady* material in the recordings even though the prosecutor chose not to obtain or review the conversations of the cooperating witness. Lodgment 5-1, part 1 at 55. In this regard, Craig argued that *Brady* did apply despite the

---

[9] This filing was supplied to the Court by the trial court judge after Respondent made him aware of this Court's order for supplemental records.

1   trial court's contrary conclusion. According to Craig, *Brady* applied because the Sheriff's

2   Department took part in a "cell search" related to the case; it is generally understood that

3   the Sheriff's Department took part in "gang" enforcement in "gang" cases; and the

4   prosecutor had the ability to access the records "with just a telephone call." Lodgment 5-

5   1, part 1 at 55.

6        In a Response to Craig's Motion for Reconsideration, Lodgment 5-1, part 1 at 61-

7   69, the prosecutor argued Craig was not entitled to discover Johnson's recorded jail calls

8   for several reasons. First, the prosecutor argued the recorded calls were not in the

9   possession of the prosecutor. The prosecutor did not request disclosure of the calls as part

10  of its investigation and the Sheriff's Department was not part of the prosecution team

11  simply because it facilitated a cell search related to the investigation of the case. In

12  support of this argument, the prosecutor attached a copy of a report about the cell

13  searches completed at the jail on November 14, 2011. Lodgment 5-1, part 1 at 62-65, 71-

14  72 (Exhibit A).

15       Second, the prosecutor argued there was no duty to disclose the recorded calls to

16  Craig under *Brady*, because the duty to disclose only arises under *Brady* as to evidence

17  possessed by the prosecution that is both material and favorable to the defense, and Craig

18  had not been able to establish either of these factors. Lodgment 5-1, part 1 at 62-68.

19  Third, the prosecutor agreed with the trial court that Craig was not entitled to review the

20  recorded calls, because he did not establish good cause. Lodgment 5-1, part 1 at 68.

21       On March 29, 2012, the trial court held a status conference and heard oral

22  arguments on Craig's Motion for Reconsideration. Lodgment 5-2 at 255-270. The trial

23  court noted that it had previously ordered release of certain discovery materials to Craig

24  and Roberson, because they made a showing of good cause; however, the trial court also

25  indicated that the materials released to them represented only "a fraction of the overall

26  material that was produced by the sheriff in response to [petitioner's] subpoena."

27

28

15

3:16-cv-02531-GPC-KSC

Lodgment 5-2 at 258. During oral argument, counsel essentially repeated the arguments made previously in their moving and opposing papers. Lodgment 5-2 at 259-264. Although it considered additional materials[10] Craig submitted "under seal" to support the Motion for Reconsideration, the trial court said, "This is a fishing expedition." Lodgment 5-2 at 268. In other words, Craig did not provide anything specific enough to justify the release of additional materials. Lodgment 5-2 at 268. The trial court did acknowledge that in "60 hours of conversation" it was likely there would be something helpful to the defense, but said the cost of transcription would be "enormous" unless the defendants could "narrow it down." Lodgment 5-2 at 268. In other words, the trial court decided not to alter its prior findings and conclusions. Lodgment 5-2 at 258-59, 264-69. On the other hand, the trial court stated it would maintain custody of the subpoenaed materials in case "good cause" develops as the case proceeds. Lodgment 5-2 at 269.

After the trial court stated it was unwilling to alter its prior ruling, Roberson's counsel indicated defense counsel could seek approval to "fund the transcription" in order to relieve some of the burden on the trial court. Lodgment 5-2 at 270. The trial court responded as follows: "I think that ultimately those extraordinary orders [for funding] are subject to court approval, so what we would basically be doing is passing the buck one more step down the line. But if somebody comes in here with an order that says that your office is going to pay for it, I'll reconsider it. Absent that, I won't." Lodgment 5-2 at 270.

Next, on April 17, 2012, Roberson's counsel filed a Motion for Transcription of Subpoenaed Jail Calls and a Declaration indicating Roberson and Craig "received funding to pay for that transcription." Lodgment 5-1, part 1 at 74-75. According to

---

[10]     It would appear that these materials would include the sealed declaration of Investigator Jon Lane, which was dispatched to this Court by the California Court of Appeals after it was made aware of this Court's order for supplemental records.  No. 31-2, at 5.  The declaration includes Mr. Lane's account of interviews conducted with Jacquett and Wiggins, and relates information substantially similar to what the two men would go on to testify at trial.

counsel's Declaration, $5,000 had been approved to pay for the costs of transcribing Johnson's recorded jail calls. The Motion essentially requested that the trial court have the recorded jail calls transcribed and then conduct an *in camera* review to determine whether all or some of the calls should be released to defense counsel. Lodgment 5-1, part 1 at 74.

On May 2, 2012, the trial court issued an Order Denying Motion for Transcription of Subpoenaed Jail Calls. Lodgment 5-2 at 47. The Order referred to and incorporated the previous Order filed on March 7, 2012 and essentially concluded that the request to have Johnson's jail calls transcribed remained a "fishing expedition," even though the parties expressed a willingness to pay the transcription costs. Lodgment 5-2 at 47-48. Specifically, the trial court held that "[a] fishing expedition is no less so simply because one of the parties is willing to pay for the boat." *Id.* at 48. Since the parties had not shown "good cause," it was the trial court's view that the parties had no legal right "to roam through these materials." Lodgment 5-2 at 48.

### B. Trial Proceedings

Trial commenced on August 1, 2012. Lodgment 5-6 at 96. On August 24, 2012, Johnson's girlfriend, Carmen Torres, testified for the prosecution. Lodgment 1-10 at 40 *et seq.* Following her testimony, defense counsel argued there was good cause for the trial court to release Johnson's recorded jail conversations to telephone numbers associated with Torres, because her trial testimony indicated she "gave two very different statements" during the time period January 25, 2011 to May 18, 2011. Lodgment 1-10 at 62-65. After several discussions on the record with all counsel outside the presence of the jury, including a substantial discussion on the logistics of locating the particular jail recordings related to Torres, the trial court concluded there was good cause for the release of this limited set of Johnson's recorded jail telephone calls to all counsel. Lodgment 1-10 at 62-65, 95-98; Lodgment 1-11 at 15, 47-50, 100-06, 112-14. The trial

court then provided all counsel with disks containing digital files of Johnson's recorded jail calls to Torres from January 25, 2011 to May 28, 2011. Lodgment 1-11 at 112-14. Torres was then recalled for additional testimony. At that time, defense counsel were able to use this portion of Johnson's recorded jail calls to cross-examine Torres. Lodgment 1-14 at 81 *et seq.*

The prosecution's other key witness against Craig was Tony Mallard. Mallard was subpoenaed and transferred from prison to testify against his will. Lodgment 1-8 at 249. Mallard testified that he told a police detective he had a conversation with Craig at a birthday party in October 2010, before Craig was arrested for his involvement in the shooting. Lodgment 1-8 at 252. According to Mallard, Craig said he was trying to shoot a member of a rival gang but accidentally hit a female. Mallard also said he asked Craig why he parties every day, and Craig responded that "he partied like it might be the last time or something like that." Lodgment 1-8 at 259-261. Mallard testified he was approached in a threatening manner by other gang members on Craig's behalf while in jail waiting to testify. As a result, he knew he was in danger and had to be placed in protective custody. Lodgment 1-8 at 254-257.

During trial, the defendants presented at least two witnesses to impeach Johnson's testimony. First, Kevin Wiggins testified he has known Johnson for several years and shared a cell with him before he settled the charges against him in this case. During this time, Wiggins testified that Johnson expressed fear of going to prison and even considered suicide. He denied involvement in the shooting and said he was going to make up a story so he could get a deal and go home. Lodgment 1-11 at 134-39.

Second, Tommy Jacquett testified he was "locked up" in the same block as Johnson and Wiggins for several months before Johnson agreed to testify for the prosecution in this case. He was present a number of times when Johnson talked about his case. According to Jacquett, Johnson said he heard some shots on the night in question

but did not know who fired the shots. Johnson also said his girlfriend was pressuring him to make a deal so their child would not grow up without a father. Lodgment 1-11 at 168-75. Jacquett further testified that Johnson was depressed and considered suicide because "he couldn't do that kind of time." Lodgment 1-11 at 174.

On September 17, 2012, a jury found Craig guilty of first degree murder, attempted murder, and assault with a firearm. The jury also found that Craig personally used a handgun in the commission of these offenses; was a principal in the offenses; and committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, and assist in criminal conduct by gang members. Lodgment 5-5 at 148-65.

On October 26, 2012, Craig filed a Motion for a New Trial, Lodgment 5-5 at 172, arguing once again that he should be permitted access to all of Johnson's recorded telephone calls, not just those he made to Torres, and be able to use them at a new trial. According to Craig, access to the remainder of the undisclosed tapes of Johnson's recorded jail telephone calls would have revealed more inconsistencies and would therefore have allowed counsel to conduct "a more thorough examination of Mr. Johnson." Lodgment 5-5 at 175. Craig also argued there was insufficient evidence to support the verdicts and the prosecution failed to present sufficient evidence to satisfy the law regarding accomplices. Lodgment 5-5 at 175. The People opposed the Motion on various grounds, and the trial court denied the Motion following oral arguments. Lodgment 1-17 at 1, 10-18; Lodgment 5-5 at 215-23.

On November 30, 2012, the trial court sentenced Craig to 50 years to life on count one (murder). Lodgment 1-17 at 49. On count two (attempted murder), the trial court imposed a consecutive term of nine years plus a 25-year-to-life term because the offense resulted in great bodily injury. Lodgment 1-17 at 49-50. On count three (assault with a firearm), the trial court imposed a consecutive term of one year plus one year and eight

months. Lodgment 1-17 at 50-51. In sum, Craig was sentenced to 11 years, 8 months, plus 75 years to life in state prison. Lodgment 1-17 at 51; Lodgment 14 at 3 n.2.

### C.  Direct Appeal

On January 16, 2014, Craig filed his Opening Brief on appeal. One of Craig's arguments was that the trial court abused its discretion and violated his constitutional rights under the Fifth and Sixth Amendments when it refused to review and/or to release Johnson's recorded jail calls and other jail records that Craig subpoenaed from the San Diego County Sheriff. Lodgment 11 at 3, 51-59.

In an unpublished decision filed on June 5, 2015, the California Court of Appeal affirmed in part, reversed in part, and remanded the case to the trial court with directions for further proceedings. Based on the California Supreme Court's decision in *People v. Chiu*, 325 P.3d 972, 974 (Cal. 2014), which was issued while Craig's appeal was pending, the California Court of Appeal's opinion states as follows: "[A]s a matter of law there is no aider and abettor culpability for first degree premeditated murder under the natural and probable consequences doctrine. The People conceded that the judgment needed to be reversed insofar as defendants' first-degree murder convictions are concerned because the jury was instructed guilt could be based on the natural and probable consequences doctrine, and the record does not show beyond a reasonable doubt that the jury did not rely on the doctrine." Lodgment 14 at 3. The Court of Appeal directed the trial court to "give the People the option of accepting a reduction of the first-degree murder convictions to second-degree murder or retrying them on the greater offense." Lodgment 14 at 3. If the People accepted a reduction of the judgment to second-degree murder, the trial court was directed to re-sentence the defendants accordingly. Lodgment 14 at 55.

The California Court of Appeal also rejected Craig's other claims, including his argument that he was denied his right to Due Process when the trial court denied his

request for an *in camera* review of Johnson's recorded jail calls. Lodgment 14 at 39. The California Court of Appeal did not specifically address Craig's constitutional claims. Lodgment 14 at 39-40. Among other issues, such as the sufficiency of the evidence to support the verdicts, the California Court of Appeal considered whether the trial court abused its discretion by denying Craig's request for an *in camera* review of Johnson's recorded jail calls. Lodgment 14 at 39. Citing California case law, the Court of Appeal indicated there was a policy favoring "liberal" discovery in criminal cases, but said trial courts could properly refuse to grant discovery if it appeared to be a "fishing expedition." Lodgment 14 at 39. The Court of Appeal noted that the trial court imposed a "good cause" requirement but did not find "good cause" except for "eight to 10 hours of Johnson's calls with his former girlfriend, Torres, based on inconsistencies in her statements before and after he implicated defendants." Lodgment 14 at 39 n.12. As to the remainder of Johnson's recorded jail telephone calls, the California Court of Appeal's decision states as follows: "Craig asserts the court should not have imposed a good cause requirement, because he could not determine the impeachment value of the calls without their disclosure. Any abuse of discretion, however, was harmless because defendants thoroughly attacked Johnson's credibility through other evidence, such as his own admission of lying, and the testimony of fellow inmates Wiggins and Jacquett that Johnson was terrified of a life sentence and would do anything to cut a deal with the prosecution." Lodgment 14 at 40.

On a related issue, the Court of Appeal stated that it had independently completed an *in camera* review of "Johnson's remaining jail records." Lodgment 14 at 40. According to the Court of Appeal, these records included "lists of visitors and lists of numbers he called; the court's synopsis of 18 letters Johnson wrote to his former girlfriend, Torres; and the court's notes from a proceeding in which it decided to exclude the testimony of former Belo employee, who was a paid informant as to gang members

21

frequenting the club." After reviewing "all sealed records provided [to] us" the Court of Appeal found "no exculpatory or impeachment material."[11] Lodgment 14 at 40.

Next, Craig filed a Petition for Review with the California Supreme Court on or about July 15, 2015 to exhaust his state court remedies.[12] Lodgment 15 at 1-18. Once again, Craig argued that the trial court violated his Fifth and Sixth Amendment rights by refusing to conduct an *in camera* review or release Johnson's recorded jail telephone conversations. Lodgment 15 at 13-15. On September 9, 2015, the California Supreme Court summarily denied the Petition for Review. Lodgment 16 at 1.

On December 4, 2015, Craig appeared before the trial court for re-sentencing. Lodgment 18 at 9, 11-20. As permitted by the Court of Appeal's June 5, 2015 decision, the prosecutor accepted a reduction of the first-degree murder conviction on count 1 to second-degree murder. Lodgment 18 at 10. The trial court therefore re-sentenced Craig on count one to 15 years to life plus a consecutive 25-year-to-life term on the gang-related firearm enhancement. Lodgment 18 at 15. On count two (attempted murder), the trial court re-sentenced Craig to the upper term of nine years plus a consecutive 25-year-to-life term on the firearm enhancement. Lodgment 18 at 16-17. On count three (assault with a firearm), the trial court re-sentenced Craig to a consecutive term of one year plus one year and eight months for the gang enhancement. Lodgment 18 at 17-18.

---

[11]    Given the Court of Appeal's phrasing as including only materials "provided us," it does not appear that the Court of Appeal reviewed the jail recordings.

[12]    If a petitioner fails to "properly" present his claim to the state court—by exhausting his claims and complying with the applicable state procedure—prior to bringing his federal habeas claim, then AEDPA typically bars us from reviewing the claim. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Exhaustion requires that "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *Id.* Here, Craig properly exhausted his claim by "'fairly present[ing]' every issue raised in his federal petition to the state's highest court" on direct appeal. *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) (quoting *Castille v. Peoples*, 489 U.S. 346, 351 (1989) (quotation and emphasis omitted).

Although Craig appealed following his re-sentencing, Lodgment 21, the California Court of Appeal affirmed the judgments in an unpublished opinion filed on September 12, 2016. Lodgment 22 at 1-5.

### D.    Instant Federal Habeas Corpus Petition

On October 6, 2016, Craig filed the instant federal habeas Petition. Dkt. No. 1. On February 16, 2017, respondent filed a Response, arguing that the Petition be denied because discovery of the subpoenaed jail telephone records was not a federal constitutional issue, there was no federal constitutional right to an *in camera* review, and the California Court of Appeal found no exculpatory or impeachment material during their *in camera* review of documents provided to them. Dkt. No. 11. On March 20, 2017, Craig filed his Traverse as an Answer to the Response. Dkt. No. 13.

## IV.    STANDARD OF REVIEW

### A.    Review of the Magistrate Judge's Report and Recommendation

The duties of the district court with respect to a magistrate judge's report and recommendation are set forth in Rule 72(b) of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(1). The district court "shall make a de novo determination of those portions of the report . . . to which objection is made" and "may accept, reject, or modify, in whole or in part, the findings of recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(c); *see also United States v. Raddatz*, 447 U.S. 667, 676 (1980); *United States v. Remsing*, 874 F.2d 614, 617 (9th Cir. 1989).

As to the portions of the report to which no objection is made, the Court may assume the correctness of the magistrate judge's findings of fact and decide the motion on the applicable law. *Campbell v. U.S. District Court*, 501 F.2d 196, 206 (9th Cir. 1974); *Johnson v. Nelson*, 142 F. Supp. 2d 1215, 1217 (S.D. Cal. 2001). Under such circumstances, the Ninth Circuit has held that a failure to file objections only relieves the

trial court of its burden to give de novo review to factual findings; conclusions of law must still be reviewed de novo. *See Robbins v. Carey*, 481 F.3d 1143, 1147 (9th Cir. 2007).

After Magistrate Judge Crawford issued her Report, Craig filed an objection on May 9, 2018. Dkt. No. 19. In his objections, Craig largely reiterates legal arguments previously made, and raises one challenge to the magistrate judge's factual findings. He argues that the magistrate judge "incorrectly made statements on line [18. Pg. 3] of R and R about a 'photo' where petitioner was identified by Johnson & his arm appeared to be extended." *Id.* at 2. Craig does not specify what was incorrect about this finding, and this Court cannot discern any error, since this portion of the magistrate judge's recitation of facts derives directly from the California Court of Appeal's summary of the underlying trial court proceedings. Lodgment 14, at 8. Because Craig fails to rebut the state court's factual findings with clear and convincing evidence, his objection fails. *See* 28 U.S.C. § 2254(e)(1) (state court factual findings are presumed correct, unless rebutted by clear and convincing evidence).

## B. Review of Habeas Petitions

Federal *habeas corpus* relief is available only to those who are in custody in violation of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). "A federal court may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984). "[A] mere error of state law is not a denial of due process." *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) (internal quotations omitted).

Rule 4 of the Rules Governing Section 2254 Cases requires that "[i]f it plainly appears from the face of the petition . . . that the petitioner is not entitled to relief. . . the judge shall make an order for summary dismissal." *See Hendricks v. Vasquez*, 908 F.2d 490 (9th Cir. 1990). A petition pursuant to 28 U.S.C. § 2254 "is expected to state facts that point to a real possibility of a constitutional error." *Aubut v. Maine*, 431 F.2d 688, 689 (1st

Cir. 1970). In addition, the facts alleged in the petition must be sufficiently specific to allow the Court to understand the claim. *See Hendricks*, 908 F.2d at 491–92.

### C.    AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this Petition. *See Lindh v. Murphy*, 521 U.S. 320, 336-37 (1997). AEDPA imposes a "highly deferential standard for evaluating state court rulings, which demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (internal citations and quotations omitted). Under AEDPA, a federal court must not grant habeas relief with respect to any claim adjudicated on the merits in state court unless the decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law" or (2) "based on an unreasonable determination of the facts in light of the evidence presented[.]" 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 7-8 (2002).

"'[C]learly established Federal law' under § 2254(d)(1) [refers to] the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). As a result, a lack of controlling Supreme Court precedent can preclude habeas corpus relief. *Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (concluding that the state court's decision did not unreasonably apply clearly established Supreme Court law, because the relevant cases provided "no clear answer to the question presented"). However, where the law is clearly established, a state court's judgment need not cite Supreme Court cases or display "awareness of [the Supreme Court's] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8 (emphasis removed); *see also Frantz v. Hazey*, 533 F.3d 724, 734 (9th Cir. 2008) (en banc) ("In other words, mistakes in reasoning or in predicate decisions of the type in question here—use of a wrong

25

legal rule or framework—do constitute error under the 'contrary to' prong of §
2254(d)(1).")

The court "may issue the [habeas] writ under the 'contrary to' clause if the state
court applies a rule different from the governing law set forth in [Supreme Court] cases, or
if it decides a case differently than [the Supreme Court] on a set of materially
indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). "The court may grant
relief under the 'unreasonable application' clause if the state court correctly identifies the
governing legal principle from [Supreme Court] decisions but unreasonably applies it to
the facts of the particular case." *Id.* Under the "unreasonable application" clause, the state
court decision must be "more than incorrect or erroneous" to warrant habeas relief.
*Andrade*, 538 U.S. at 75. The standard under AEDPA is not met unless the state court's
application of the law is "objectively unreasonable." *Id.* Habeas relief is only available
under Section 2254(d)(1) "where there is no possibility fair minded jurists could disagree
that the state court's decision conflicts" with Supreme Court precedent. *Harrington v.
Richter*, 562 U.S. 86, 102 (2011). In addition, "review under § 2254(d)(1) is limited to the
record that was before the state court that adjudicated the claim on the merits." *Cullen v.
Pinholster*, 563 U.S. 170, 181 (2011).

Where there is no reasoned decision from the state's highest court, Federal Courts
"look through" to the "last reasoned state-court opinion" and presume it provides the basis
for the higher court's denial of a claim or claims." *Ylst v. Nunnemaker*, 501 U.S. 797, 805-
06 (1991). If the state court does not provide a reason for its decision, the Federal Court
must conduct an independent review of the record to determine whether the state court's
decision is objectively unreasonable. *Crittenden v. Ayers*, 624 F.3d 943, 947 (9th Cir.
2010).

26

## V.    DISCUSSION

Craig contends that the trial court violated his constitutional rights to confrontation and due process under the Fifth and Sixth Amendments when it declined to complete an *in camera* review and/or to release Johnson's recorded jail telephone conversations to his trial counsel. Dkt. No. 1 at 6-7. According to Craig, Johnson's recorded jail telephone conversations should have been disclosed because they were relevant as a source of potential impeachment evidence in light of Johnson's decision to testify and identify him as the shooter. Dkt. No. 1 at 6-7.

### A.    Confrontation Clause

Craig argues that the trial court's refusal to grant him access to Johnson's recorded jail telephone recordings violated his Sixth Amendment rights under the Confrontation Clause.

"The Confrontation Clause [in the Sixth Amendment] provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination." *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987). Here, Craig's claim does not involve the first type of protection provided under the Confrontation Clause, as he does not allege he was denied the right to face Johnson as his accuser. Rather, Craig's claim falls under the right to conduct cross-examination. Craig believes that access to all of Johnson's recorded jail telephone calls was necessary for him to effectively cross-examine Johnson, because he believes the calls would have included impeachment evidence. Craig argues in his Objections that *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (citing *California v. Trombetta*, 467 U.S. 479, 485 (1984)), establishes a Constitutional guarantee under the Confrontation Clause to an opportunity for a complete defense, which includes an effective cross-examination. Respondent contends that the Confrontation Clause was not violated because Craig was afforded an opportunity to cross-examine Johnson, despite his inability to access the recordings.

Craig's allegations do not state a viable claim under the Confrontation Clause. Affording Craig an "opportunity for a complete defense" does not require an *in camera* review by the trial court or access to the subpoenaed recordings.

The Confrontation Clause is not a "constitutionally compelled rule of pretrial discovery." *Ritchie*, 480 U.S. at 52. "Normally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses." *Id.* at 53. "The ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony." *Id.* "In short, the Confrontation Clause only guarantees '*an opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' [Citation omitted.]" *Id.* (emphasis in original). Accordingly, the right of confrontation "is not implicated '[where] the trial court did not limit the scope or nature of defense counsel's cross-examination in any way.'" *Id.* (quoting *Delaware v. Fensterer*, 474 U.S. 15, 294 (1985)). In *Ritchie*, the petitioner argued that the lower court's decision to deny him access to Children and Youth Services (CYS) files documenting his daughter's statements to her CYS counselor hindered his ability to conduct an effective cross-examination and thus violated the Confrontation Clause. *Id.* at 51-52. He believed that the CYS record could potentially show that his daughter made statements that were inconsistent with her trial statements or that she acted with an improper motive. However, the Supreme Court found that, because the court did not limit the petitioner's cross-examination of his daughter in any way, his right to confrontation was not violated. *Id.* at 51, 54.

Here, Craig does not in any way allege that the trial court improperly restricted his ability to cross-examine Johnson by preventing him from asking Johnson certain types of questions. As a result, he does not have a viable constitutional claim under the Confrontation Clause and cannot establish an unreasonable application of clearly

established Supreme Court law. *See Kentucky v. Stincer*, 482 U.S. 730, 744 (1987) (holding that respondent's rights under Confrontation Clause were not violated where respondent had "opportunity for full and effective cross-examination of [ ] witnesses during trial"); *Coleman v. Calderon*, 150 F.3d 1105, 1112 (9th Cir. 1998) (holding that defendant's right to confront witnesses was not violated where he exercised right to confront and cross-examine the witness at trial), *rev'd on other grounds*, 525 U.S. 141 (1998); *Newsome v. Ryan*, No. 05CV1534IEG(RBB), 2007 WL 433282, at *11-17 (S.D. Cal. Jan. 24, 2007) (finding no Confrontation Clause violation where Petitioner had an opportunity to cross-examine forgetful witnesses, Petitioner impeached their forgetfulness by calling investigators who interviewed each witness, and jury was able to assess the witnesses and the testifying officers' demeanor and credibility). Accordingly, this Court **ADOPTS** the Magistrate Judge's recommendation to **DENY** habeas relief on Craig's Confrontation Clause claim.

## B. Due Process: *Brady*

Craig identifies two violations of his due process rights under *Brady*, 373 U.S. at 87-88. In state court, he argued that there was a duty on the part of the prosecution under *Brady* to provide access to the phone calls recorded by the Sheriff's Department at the jail where Johnson was held. Craig also argues that the trial court's refusal to disclose Johnson's recorded jail calls constituted a due process violation. Respondent contends that both arguments involve recordings in the possession of parties who were not part of the prosecution—the Sheriff's Department and the trial court—and that, therefore, *Brady* does not apply.

*Brady* is the primary source of a criminal defendant's Due Process right to pre-trial discovery. Under *Brady*, due process is violated where 1) the *prosecution* suppresses evidence that is 2) *favorable* to the defendant and 3) *material* either to guilt or to punishment. *Id*. at 87. Evidence is favorable where it is exculpatory or impeaching.

*Runningeagle v. Ryan*, 686 F.3d 758, 769 (2012) (quoting *Strickler v. Greene*, 527 U.S.
263, 281-82 (1999)). Evidence is material "'if there is a reasonable probability that, had
the evidence been disclosed to the defense, the result of the proceeding would have been
different.' [Citation omitted.]" *Strickler*, 527 U.S. at 280. "The mere possibility that an
item of undisclosed information might have helped the defense, or might have affected the
outcome of the trial does not establish 'materiality' in the constitutional sense." *United
States v. Agurs*, 427 U.S. 97, 109-10 (1976). The prosecutor's duty to disclose
"encompasses impeachment evidence as well as exculpatory evidence" and extends even
to evidence "known only to police investigators and not to the prosecutor. [Citation
omitted.]" *Strickler*, 527 U.S. at 280.

More recent cases have stated the *Brady* rule in broader terms. In *Kyles v. Whitley*,
514 U.S. 419, 433-34 (1995), for example, the Supreme Court stated as follows: "[T]he
individual prosecutor has a duty to learn of any favorable evidence known to the others
acting on the government's behalf in the case, including the police." *Id.* at 437. *See also
Youngblood v. W. Virginia*, 547 U.S. 867, 869-70 (2006); *Garcetti v. Ceballos*, 547 U.S.
410, 447 (2006); *Strickler*, 527 U.S. at 281. In *Kyles*, the Supreme Court held that a
prosecutor had a duty to learn of favorable evidence known to other prosecutorial and
investigative agencies acting on the prosecution's behalf, including police agencies. *See
Kyles*, 514 U.S. at 437-48.

This Court agrees that the trial court's refusal to grant Craig access to the subpoenaed
recordings does not constitute a *Brady* violation because the first prong, suppression by the
prosecution, is not met. The state court held that the "sheriff is not part of the prosecution
team with respect to these materials, but instead possesses them merely as a result of his
status as the operator of the custodial facility where Johnson is housed." Lodgment 5-6 at
65. In finding that *Brady* did not apply, the state court necessarily concluded that the
Sheriff's Department was not acting on the "prosecution's behalf." *See id*; Lodgment 5-6

at 65. *See United States v. Merlino*, 349 F.3d 144, 154 (3d Cir. 2003) ("*Kyles* cannot be read as imposing a duty on the prosecutor's office to learn of information possessed by other government agencies that have no involvement in the investigation or prosecution at issue."). This Court has not located, nor has Petitioner identified, any clearly established law to establish that a third party Sheriff's Department would be subjected to *Brady's* requirements. Accordingly, the trial court's determination that *Brady* did apply was not contrary to clearly established Supreme Court precedent.

Moreover, neither the second nor the third prong under *Brady*, favorability and materiality, are met. To state a *Brady* claim, the defendant must do more than "merely speculate" about what information the suppressed evidence would reveal. *Runningeagle*, 686 F.3d at 769. *See also Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (reversing the Ninth Circuit's grant of habeas for a *Brady* violation because the Ninth Circuit "grant[ed] habeas relief on the basis of little more than speculation with slight support"). In *Runningeagle*, a capital defendant claimed that his co-defendant's former cellmate may have told prosecutors that the co-defendant committed the murders in question alone. *Id.* at 771. The court found this statement insufficient to demonstrate that the cellmate's statements were material and favorable to the defendant. *Id.* In other words, the defendant's *Brady* claim was unsupported because he only *speculated* as to the cellmate's statements to prosecutors and there was no reasonable probability that the outcome of the trial or sentencing would have been different had the statements been disclosed. *Id.*

Here, Craig's claim parallels that of the defendant's in *Runningeagle* in that he too only *speculates* regarding the content of the undisclosed recordings. No evidence exists suggesting there is a reasonable probability that the outcome of Craig's case would have been different had Johnson's recordings been disclosed. Craig's allegations do not demonstrate that the subpoenaed recordings were favorable to him or material. Accordingly, this Court finds that Craig does not have a viable Due Process claim under

*Brady*. *See Marks v. Davis*, Case No. 11-CV-02458, 2016 WL 6696126, at *6 (N.D. Cal. Nov. 15, 2016) (holding that rejection of Petitioner's claim was not objectively unreasonable where Petitioner offered only speculation in support of it); *Carillo v. Hernandez*, Case No. CV 08-5616-ODW(CW), 2014 WL 103109, at * 11 (C.D. Cal. Jan. 8, 2014) (holding that Petitioner's failure to show that evidence sought would have been favorable to him or material indicates that claim is based on "pure speculation, which is manifestly insufficient to warrant habeas corpus relief"); *Duy Pham v. Ewen*, Civil No. 03-0462 WQH (JMA), 2013 WL 2475865, at *23 (S.D. Cal. June 6, 2013) (finding no *Brady* violation where Petitioner's claims were little more than "conclusory and speculative assertions" that failed to support inference that evidence withheld would be favorable to him). Accordingly, this Court **ADOPTS** the Magistrate Judge's recommendation to **DENY** habeas relief on Craig's *Brady* claim.

### C. Due Process: *Ritchie*

Craig argues that the trial court's denial of his request for disclosure and for an *in camera* review of Johnson's phone recordings violated his right to Due Process. Respondent contends that a constitutional right to discovery in a criminal case does not exist. The trial court rejected Craig's request on the basis that his request was nothing more than a "fishing expedition" and that he failed to make the requisite good cause showing that Johnson's recorded jail calls were material to the fairness of the trial.

The Supreme Court has asserted that "there is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). In *Pennsylvania v. Ritchie*, however, the Supreme Court indicated that a criminal defendant seeking access to confidential or privileged materials outside the possession of the prosecutor has a Due Process right to disclosure and/or an *in camera* review if "some plausible showing" is made to indicate the records include evidence that is both material and exculpatory to the defense. *Ritchie*, 480 U.S. at 56-61, 58 n.15.

The Court must first determine the clearly established "rule" to be derived from *Ritchie*. *Ritchie* addressed the threshold burden to obtain *in camera* review in a footnote:

> The Commonwealth also argues that Ritchie is not entitled to disclosure because he did not make a particularized showing of what information he was seeking or how it would be material. See Brief for Petitioner 18 (quoting *United States v. Agurs*, 427 U.S. 97, 109–110, 96 S.Ct. 2392, 2400–01, 49 L.Ed.2d 342 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense ... does not establish 'materiality' in the constitutional sense")) Ritchie, of course, may not require the trial court to search through the CYS file without first establishing that it contains material evidence. See *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1992) [ (1982) ] ("He must at least make some plausible showing of how their testimony would have been both material and favorable to his defense"). Although the obligation to disclose exculpatory material does not depend on the presence of a specific request, we note that the degree of specificity of Ritchie's request may have bearing on the trial court's assessment on remand of the materiality of the nondisclosure. See *United States v. Bagley*, 473 U.S. 667, 682–683, 105 S.Ct. 3375 3383–3384, 87 L.Ed.2d 481 (1985) (opinion of BLACKMUN, J.).

*Id.* at 58 n.15.

While the Ninth Circuit does not appear to have addressed the parameters of *Ritchie*, other circuit have interpreted the *Ritchie* footnote to establish a plausibility threshold for *in camera* review. The Sixth Circuit has held that the clearly-established Supreme Court precedent in *Ritchie* is that a defendant is entitled to an *in camera* review of evidence to determine whether it contains information that would have changed the outcome of the trial if the defendant has "establish[ed] a basis for his claim that it contains material evidence" by making "some plausible showing of how [the] testimony would have been both material and favorable to the defense." *Renusch v. Berghuis*, 75 Fed. Appx. 415, 423 (6th Cir. 2003) (citing *Ritchie*, 480 U.S. at 58, 58 n.15). The Sixth Circuit's articulation of the *Ritchie* standard was adopted by the Seventh Circuit in *Dietrich v. Smith*, which held that a Wisconsin appellate court reasonably applied *Ritchie* by finding the defendant's due

process claim insufficient because he failed to make a plausible showing that the evidence sought would produce material evidence. *Dietrich v. Smith*, 701 F.3d 1192, 1197 (7th Cir. 2012). *See also Moseley v. Kemper*, 860 F.3d 1020, 1025 (7th Cir. 2017) (holding that it was not unreasonable for appellate court to deny *in camera* review, as Petitioner failed to establish why the evidence was relevant, let alone material).

The Court agrees with the Sixth and Seventh Circuits and finds that the clearly established "rule" of *Ritchie* is that a defendant seeking discovery from a third party is entitled to *in camera* review by the trial court only where the defendant has "establish[ed] a basis for his claim that it contains material evidence," by making "some plausible showing of how [the] testimony would have been both material and favorable to [the] defense." *See Renusch*, 75 F. App'x at 424. Under this rule, while "the obligation to disclose exculpatory material does not depend on the presence of a specific request," the "degree of specificity" of any request "may [properly] have a bearing on the trial court's assessment . . . of the materiality of the nondisclosure." *Ritchie*, 480 U.S. at 58 n.15.

In the underlying proceedings, the trial court insisted that Craig make a showing of "good cause," i.e., "specific facts justifying discovery," before it would conduct *in camera* review and order disclosure of the subpoenaed materials. Craig attempted to meet this requirement by submitting under seal his February 29, 2012 motion for discovery of, *inter alia*, (1) the entirety of the recordings, on the grounds that "[t]here can be no doubt that in prior phone conversations Mr. Johnson made statements contrary to his present version of events," (2) a phone call between Craig to Johnson, and (3) any "similar phone conversations" tending to show that "Mr. Craig was not involved" in the shooting. Dkt. No. #31-1, at 14–18. Pursuant to its good cause standard, the trial court conducted an *in camera* review for any recorded calls between Craig and Johnson. Dkt. No. 31-3, at 1. However, the trial court did not find good cause to release the entirety of the jail phone recordings or to scour them *in camera* for statements which would impeach Johnson's

credibility or exculpate Craig of Johnson's claim that he was involved in the shooting. *Id.* After Johnson's girlfriend, Carmen Torres, gave conflicting testimony at trial, the trial court found good cause to release approximately ten hours of recorded calls between Johnson and Torres.

For the reasons articulated below, the Court finds that the California Court of Appeals' decision to affirm the trial court was neither contrary to, nor an unreasonable application of *Ritchie*.

First, that the trial court invoked a "good cause" standard under *Barrett*, instead of the "plausible showing" standard articulated in *Ritchie*, does not make its holding "objectively unreasonable" under AEDPA. *See Harrington*, 562 U.S. at 98 (explaining that a state court "need not cite or even be aware of" the Supreme Court's cases under § 2254(d) to pass muster under AEDPA). As the Supreme Court recognized, a disputed state-court holding may withstand habeas review "[s]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court] precedent." *Early*, 537 U.S. at 8. Here, the trial court's analysis comports with the clearly-established rule in *Ritchie* that *in camera* review requires a threshold, plausible showing of materiality and favorability.

Consistent with *Ritchie*, the trial court reasonably evaluated the specificity of Craig's requests against the many hours of recordings at hand, and determined that but for the particularized requests made with respect to Torres and Craig, no other recordings merited disclosure or *in camera* review. *See Ritchie*, 480 U.S. at 58 n.15 ("Although the obligation to disclose exculpatory material does not depend on the presence of a specific request, . . . the degree of specificity of Ritchie's request may have bearing on the trial court's assessment on remand of the materiality of the nondisclosure."). Based on the large volume of Johnson's recorded jail calls during two or so years of incarceration awaiting trial, the poor quality of the recordings, and the amount of time it would have taken to examine

them, the claims of Craig and his co-defendants could have reasonably been seen as speculative. Lodgment 5-2 at 268. As the trial court explained, the cost of transcription and the time implicated by *in camera* review would be "enormous" unless the defendants could "narrow it down." Lodgment 5-2 at 268. In other words, the trial court's classification of Craig's request for the totality of the recordings as a "fishing expedition" and requirement of a narrower scope of request do not contradict Supreme Court precedent, but are rather consistent with it.

Moreover, the California Court of Appeal and the state trial court essentially concluded, in an objectively reasonable manner, that Craig did not make a "plausible showing" indicating how all sixty hours of Johnson's recorded jail calls were "material to the fairness of the trial." *Renusch*, 75 Fed. App'x. at 423. As previously discussed *supra* in Section V.B. with respect to Craig's *Brady* claim, it was not unreasonable for the state courts to reject Craig's requests for want of materiality. Indeed, despite Craig's adamant assertion that "[t]here can be no doubt that in prior phone conversations Mr. Johnson made statements contrary to his present version of events," Craig's argument for discovery rested on no more than his speculation that those phone calls existed. *See, e.g.*, *Hall v. Scribner*, 619 F.Supp.2d 823, 849–50 (N.D. Cal. 2008) (denying a habeas petition under *Ritchie* because petitioner's request for psychiatric records on the basis that they "might contain unspecified information bearing on Ryan's credibility as a witness or might contain some evidence of her engaging in prostitution" was insufficient to demonstrate materiality).

The state courts' adverse determination on materiality is further bolstered by the fact that much of the information sought by Craig was cumulative of what the defense already had on hand. *See United States v. Kohring*, 637 F.3d 895, 908 (9th Cir. 2011) (impeachment evidence is not material if it is "merely cumulative" with other forms of impeachment evidence (quoting *Hovey v. Ayers*, 458 F.3d 892, 921 (9th Cir. 2006)). Craig's discovery request was predicated on his claim that *in camera* review might unearth

other phone conversations in which Johnson "told inconsistent stories." Dkt. No. 31-1, at 16. At the time of the request, however, defense counsel had already interviewed two witnesses, Wiggins and Jacquett, *id.* at 17, who were primed to testify that Johnson was willing to commit perjury to avoid a life sentence; both men gave impeachment testimony as to Johnson at trial. Thus, it was understandable for the state courts to conclude that any additional impeachment evidence on this issue would have marginal value. *See, e.g.*, *Davis v. Litscher*, 290 F.3d 943, 947 (7th Cir. 2002) (denying habeas relief under *Ritchie* because no plausible showing of materiality was made where the petitioner "failed to demonstrate how the sought after records would bolster his defense or add genuinely useful since he already possessed facts material to impeaching" the witness whose records were subject to privilege).

Accordingly, it was not unreasonable for the state court to conclude that Craig failed to plausibly show with specific information that the calls would contain information that was material to the fairness of the trial and thus refuse to conduct an *in camera* review. *See Dietrich*, 701 F.3d at 1198 (denying habeas relief where Petitioner "failed to make a plausible showing that the [records sought] contained evidence material to his defense"); *Brown v. Sheets*, No. 2:06-cv-448, 2007 WL 3024456 (S.D. Ohio Oct. 15, 2007) (dismissing Petitioner's claim that he was improperly denied an *in camera* review of evidence where petitioner failed to make a plausible showing of how the evidence would have been material and favorable to him.[13]

---

[13] The Report further supports its recommendation to deny Craig's petition by asserting that § 2254(d) "gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them. Dkt. No. 14 at 29 (quoting *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). While this may be true, this Court finds this portion of the Report irrelevant to the current case. In *Lonberger*, the Supreme Court rejected the Sixth Circuit's reassessment of a witness' credibility, which had already been determined by the state court. *Lonberger*, 459 U.S. at 434 (holding that Sixth Circuit was "bound to respect. . . . the finding of the Ohio trial court that respondent was 'an intelligent individual, well experienced in the criminal processes and well represented in all stages of the proceedings by competent and capable counsel in Illinois' and had no authority to re-assess the effect of respondent's testimony at the Ohio state trial court hearing"). Here,

To be sure, it may have been more prudent for the trial court to have conducted an *in camera* review of all sixty hours of jail phone recordings, especially since defense counsel had secured funding for their transcription. Further, it is not surprising to this Court that Magistrate Judge Crawford—were she to have considered the issue in the first instance—would have found that Craig and his co-defendants made a "plausible showing" sufficient to warrant *in camera* review under *Ritchie*. However, the question on federal habeas review is not whether the state court's application of clearly established Supreme Court law aligns with that of the court sitting in habeas; rather, the focus of inquiry is "whether the state court's application of clearly established federal law is objectively unreasonable." *Bell*, 535 U.S. at 694. As explained above, and as demonstrated by similar cases decided by the Sixth and Seventh Circuit, this Court cannot grant habeas relief. *See Harrington*, 562 U.S. at 102 (habeas relief is available only "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts" with Supreme Court precedent).

Finally, even assuming arguendo that the state court erred under *Ritchie*, any error was harmless because it did not have "a substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993); *see also Fry v. Pliler,* 551 U.S. 112, 12122 (2007) (even if state court does not have occasion to apply the test for assessing prejudice applicable under federal law, the *Brecht* standard applies uniformly in all federal habeas corpus cases under § 2254); *Larson v. Palmateer*, 515 F.3d 1057, 1064 (9th Cir. 2008) (review for harmless error under *Brecht* is "more forgiving" to state court errors than the harmless error standard the Supreme Court applies

---

this Court does not seek to re-determine Johnson's credibility, but to examine whether the state court erred in withholding evidence that Craig and his co-defendants intended to use to attack Johnson's credibility, thus denying them the opportunity to further challenge Johnson's credibility.

on its direct review of state court convictions).[14] Craig and his co-defendants were already able to impeach Johnson's testimony through Johnson's own admission of lying and the testimony of Wiggins and Jacquett that Johnson intended to make up a story and "was terrified of a life sentence and would do anything to cut a deal with the prosecution." Lodgment 14 at 40. Similarly, ten hours of the subpoenaed calls *were* released to counsel and these materials were used to question Johnson's motivation to lie, including statements by Johnson that he'd "take a deal for something he did not do" and "just wants to get out of [jail], like now, by any means necessary." *Id.* at 17. Certain portions of these were even played to the jury. *See* Lodgment 1-14 at 87-90. As a result, the jury was presented with a substantial amount of impeachment material regarding Johnson's motive to lie about the incident. Thus, even assuming Craig had proven a *Ritchie* error, he is not entitled to federal habeas relief because the alleged error would not have had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

Based on the foregoing, it was not objectively unreasonable under clearly established Supreme Court law for the state court to deny Craig access to Johnson's recorded jail calls

---

[14] AEDPA requires the federal habeas court to defer to any state court determination of harmless error unless the holding is in "conflict with the reasoning or the holdings of [Supreme Court] precedent or if it applied harmless-error review in an objectively unreasonable manner." *See Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005) (internal quotation marks and citations omitted).

In this case, the California Court of Appeals rendered a harmless error analysis, Lodgment 12-45, at 40, but did not specify whether it was applying a state-law standard or the harmless error standard applicable to federal constitutional violations, i.e., *Chapman v. California*, 386 U.S. 18, 24 (1967). There is no indication that the Court of Appeals applied *Chapman*, which specifies a "harmless beyond a reasonable doubt" standard. *Id.* On the contrary, the discussion as to the jail phone recordings indicates a primary focus on *state law* governing criminal discovery.

But, regardless of whether the California Court of Appeals conducted the proper harmless error analysis, the Supreme Court has held that when a federal habeas court reviews a state-court harmless error decision, it is required to determine whether the assumed error was harmless under *Brecht*, 507 U.S. 619. *See Fry*, 551 U.S. at 119–22; *see also Pulido v. Chrones*, 629 F.3d 1007, 1012 (9th Cir. 2010) (holding that a federal habeas court "need not conduct an analysis under AEDPA of whether the state court's harmlessness determination on direct review . . . was contrary to or involved an unreasonable application of clearly established federal law . . . because the *Brecht* test 'obviously subsumes' the more liberal" AEDPA standard (quoting *Fry*, 551 U.S. at 119-20)).

and refuse to conduct an *in camera* review of the entire 60 hours of recorded material. Dkt. No. 14 at 29. Accordingly, this Court **ADOPTS** the Magistrate Judge's recommendation to **DENY** Craig's *Ritchie* Due Process claim.

## VI. Certificate of Appealability

Rule 11 of the Federal Rules Governing § 2254 Cases provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate of appealability should be issued only where the petition presents "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A certificate of appealability "should issue when the prisoner shows . . . that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court concludes that jurists of reason could find it debatable whether Craig has stated a valid claim of the denial of Due Process. Craig has made a substantial showing indicating that the records contained evidence that was material and exculpatory to the defense and, thus, the trial court should have conducted an *in camera* review of the recordings. *See id.* Although the Court has determined that it was objectively reasonable for the state court to deny Craig's request for disclosure and an *in camera* review of Johnson's phone recordings, such a determination is reached with some hesitation. While Craig's request would have required the disclosure or review of fifty-to-sixty hours of phone recordings and lacked specificity with regard to which particular phone calls he was interested in examining, a reasonable jurist could believe that the California courts were unreasonable because Craig *had* sufficiently made a plausible showing that the records sought contained material and exculpatory evidence. Given the inconsistencies between Johnson's testimony and evidence implicating other parties in the crime, such as clothing

40

matching Roberson's that was found at the scene and carried traces of gunpowder residue, it is possible that a reasonable jurist could find that the "petition should have been resolved in a different manner." *Id.* (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4); *see Dietrich v. Smith*, No. 11-C-117, 2012 WL 602757 (E.D. Wis. Feb. 23, 2012) (granting certificate of appealability regarding "plausible showing" required by *Ritchie* for *in camera* review and finding that "jurists of reason could disagree with this court's resolution of [Petitioner's claim and] that the due process issue. . . . is adequate to deserve encouragement to proceed further").

Furthermore, questions of first impression within a circuit warrant the granting of a certificate of appealability. *See Melton v. Sec'y, Fla. Dep't of Corr.*, 778 F.3d 1234, 1237-38 (11th Cir. 2015) (Martin, B., dissenting) (contending that a certificate of appealability should have been granted "because the [issues at hand] are one of first impression, debatable, and likely to come up in other cases") *and United States v. Espinoza-Saenz*, 235 F.3d 501, 502 (11th Cir. 2000) ("Because this presents a question of first impression in this circuit, we conclude that the issue merits further judicial consideration, and we grant a certificate of appealability").[15] Because the particular standard that a defendant must meet to justify entitlement to an *in camera* review under *Ritchie* is a question of first impression in this circuit and is both "debatable" and "likely to come up in other cases," it is appropriate for this Court to grant a certificate of appealability.

Accordingly, the Court **GRANTS** a certificate of appealability.

**CONCLUSION**

---

[15]     *But see S.E.C. v. Richetelli*, No. 3:09-cv-361(CFD), 2010 WL 4823237 (D. Conn. Nov. 22, 2010) (holding that "the mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion" and, thus, certificate of appealability should not be automatically granted to questions of first impression (quoting *In re Flor*, 79 F.3d 281, 284 (2d Cir. 1996)).

41

For the reasons set forth above, the Court **ADOPTS** the Magistrate Judge's Report and Recommendation, **OVERRULES** Petitioner's Objections, **DENIES** Petitioner's Petition, and **GRANTS** a certificate of appealability.

    **IT IS SO ORDERED.**

Dated:  July 3, 2019

Hon. Gonzalo P. Curiel
United States District Judge

3:16-cv-02531-GPC-KSC